American Investment Company of Illinois and American Banking Company for the Use of Said American Investment Company of Illinois, Appellees, v. United States Fidelity and Guaranty Company, Appellant.

Gen. No. 8,551.

Opinion filed April 27, 1932.
Rehearing denied October 4, 1932.

HOOPES & PEFFERLE, for appellant.

BARBER & BARBER, for appellees.

MR. JUSTICE ELDREDGE delivered the opinion of the court.

Appellees recovered a judgment for $26,542.30 against appellant on a blanket bond or fidelity policy guaranteeing appellees against loss of money or securities by reason of the dishonesty of their employees, which, it is claimed, included one Luman Burch.

The bond in question is what is termed "Bankers' Blanket Bond." The provisions of this bond so far as they are pertinent to the issues in this case are as follows:

"Section 1. The UNITED STATES FIDELITY AND GUARANTY COMPANY, a corporation of the State of Maryland, with its Home Office in the City of Baltimore, Maryland, hereinafter called the Underwriter, in consideration of an annual premium agrees to indemnify AMERICAN INVESTMENT COMPANY OF ILLINOIS, A DELAWARE CORPORATION, AND/OR AMERICAN BANKING COMPANY, A. T. I. M. A. SPRINGFIELD, ILLINOIS, hereinafter called the Insured, against the direct loss, sustained while this bond is in force and discovered as hereinafter provided, of any money or securities, or both, as defined in Section 5 hereof, in which the Insured has a pecuniary interest, or held by the Insured as collateral, or as bailee, trustee or agent, and whether or not the Insured is liable therefor (such money and securities being hereinafter called Property), in an amount not

exceeding .....................................
TWENTY-FIVE THOUSAND ................... dollars
($25,000.00), as follows:

"A. Through any dishonest act, wherever committed, of any of the Employees, as defined in Section 6 hereof, whether acting alone or in collusion with others.

"B. Through robbery, burglary, larceny (whether common-law or statutory), theft, hold-up or destruction (however or by whomsoever such destruction may be caused, and whether it be effected with or without violence), while the Property is actually within any of the offices of the Insured covered hereunder, or is actually within any recognized place of safe deposit within the United States; or is actually within the premises of any of the Insured's correspondent banks within the United States; or is actually within the premises of any transfer or registration agent within the United States for the purpose of exchange, conversion, registration or transfer in the usual course of business.

"C. Through robbery, larceny (whether common-law or statutory) theft, or hold-up by whomsoever committed while the Property is in transit within twenty miles of any of the Insured's offices covered hereunder and in the custody of any of the Employees, or through negligence on the part of any of the Employees having custody of the Property while in transit as aforesaid. The Property shall be deemed to be in transit from the moment the transporting Employee or Employees actually depart from the office or premises at which the Property shall be received up to the moment of delivery at its destination.

"Sec. 6. The word 'Employees' as used herein shall be deemed to mean the officers, clerks, and other persons in the immediate employ of the Insured during the currency of this bond at its office or offices

covered hereunder, but not to mean any person or persons employed by any other banking institution which the Insured shall have taken over, unless the Underwriter shall have given its written consent thereto, nor to mean any persons, firms or corporations furnishing transportation, trucking, messenger service or the like, or any person or persons employed thereby.

"Sec. 7. This bond does not cover—

"a—Any loss resulting directly or indirectly from forgery, unless the forgery be committed by or in collusion with one or more of the Employees.

"b—Any loss through larceny or theft committed by any person to whom any Employee shall have, otherwise than through dishonesty, delivered property or extended credit.

"c—Any loss resulting directly or indirectly from any of the following causes: insurrection, riot, or civil commotion (unless the Property is lost while in the custody of an Employee under the circumstances defined in Paragraph C of Section 1 hereof, and unless, when such employee was dispatched, there was no knowledge on the part of the Insured, or its officers or partners, of such insurrection, riot or civil commotion), earthquake, volcanic eruption or similar disturbances of nature, military or usurped power.

"d—Any loss resulting directly or indirectly from the act or acts of any director of the Insured, other than one employer as a salaried official, or of any partner of the Insured.

"e—Any loss of Property, unless prior to the occurrence of such loss an Employee or Partner of the Insured shall have examined such Property and made a record thereof, which shall contain the nominal value and description of such Property and be sufficient for the purpose of determining the amount of such loss. It is understood that this clause shall not apply to any loss of Property which the Insured shall show to have

occurred on the date of the receipt of such Property by or on behalf of the Insured, nor shall it apply to loss of property owned by the Insured.

"f—Any loss resulting from authorized or unauthorized transactions in Foreign Exchange arising out of fluctuations in such Exchange.

"h—Any loss of Property contained in customers' safe deposit boxes, unless such loss be sustained through any dishonest act of an identifiable employee under such circumstances as shall make the Insured legally liable therefor.

"Sec. 8. No statement made in the application for this bond or otherwise submitted by or in behalf of the Insured shall be deemed a warranty of anything except of the fact that the statement is true to the best of the knowledge and belief of the person making it.

"Sec. 9. The value of any securities for which claim may be made hereunder shall be determined by the average market value of such securities on the day before the discovery of their loss. If the securities have no quoted market value and their value cannot be agreed upon, it shall be determined by arbitrators; one to be selected by the Insured, one to be selected by the Underwriter, and (in the event of their failure to agree upon the amount of the claim) a third to be named by the two so selected. The written decision of a majority of the said arbitrators shall be binding and conclusive; and the total expense of such arbitration shall be borne by the Underwriter."

The bond carries two riders, paragraph eight of the second rider is as follows:

"8. This Bond Does Not Cover:

"Any loss resulting directly or indirectly, from trading, actual or fictitious, whether in the name of the insured or otherwise, and whether or not within the knowledge of the insured, and notwithstanding any act or omission on the part of any employee in con-

nection therewith, or with any account recording the same.''

The bond itself and each of the riders purports to have been executed May 27, 1926, but the evidence shows that appellees had been previously carrying a similar bond in another company and that negotiations between them and appellant for the bond in question had been carried on during the months of June and July of that year before the transaction was actually completed, and that the bond and the riders were predated as of May 27, 1926. The evidence further shows that on June 3, 1926, in a letter written by appellant to appellees, reasons are advanced why appellees should take the bond or policy of appellant in preference to the one which they had or had had in the other company. In this letter it is stated among other things: ''We are attaching hereto Bankers Blanket Bond application which we will please ask you to complete in its entirety. We have mentioned elsewhere in this letter, we would like to have a list of your present occasional attorney roster. Will you please give us a memorandum supplementing application, indicating character of business carried on by your parent and subsidiary companies.

''We wish to have a list of your employees, both salaried force and commissioned. . . .

''Premiums must be computed on all employees of every character whose duties relate to banking or require their presence at any time within the banking office. Premium is corrected annually. There are no charge and no deductions for employees temporarily employed or temporarily absent during the year.

''Having now explained chronologically each point under this coverage, we will appreciate your earnest advice as to the final disposition of this matter.''

In a letter written on the same day supplementing the letter above mentioned appellant wrote in regard to some of the provisions of the purported policy or

bond and concludes as follows: "We will appreciate you letting us have completed application as soon as possible." In response to the above letters appellees on July 13, 1926, sent to appellant the supplemental application for the policy as follows:

"July 13, 1926

W. W. Swett, Jr., Insurance Agency,
General Agents,
United States Fidelity & Guaranty Co.,
Springfield, Illinois.
Gentlemen:

In accordance with your request and for the purpose of issuing our Employees Surety Bond, we are submitting herewith the following information.

We desire this bond to be issued to cover the following companies:

American Investment Company of Illinois,
a Delaware Corporation,
and/or American Banking Company.

We have divided representation of the Companies in the following manner:

1—Employees (Salaried force)
2—Brokers (Commission men)
Sub-Brokers (Commission men)
3—Credit Checkers and Collectors
4—Occasional Attorneys.

No. 1—EMPLOYEES (Salaried Force)

The following is a list of officers and employees located in the Home Office, Springfield, Illinois. You will note that we have specifically designated our traveling representatives who travel out of the Springfield Office and are on a salaried basis." (Here follows a list of 73 employees.)

Then under the heading,

"No. 2—BROKERS (Commission men)
SUB-BROKERS (Commission men)"

are listed brokers and their employees in the States

of Iowa, Missouri, Illinois, Kansas and Michigan. Among those listed in Michigan are:

"MICHIGAN

Grand Rapids, Michigan

Curtis & Clark, Inc., Brokers

A. G. Curtis

R. H. Clark

Hulda Gen, Employee

Eva Somervill, Employee

Jack Carpenter, Employee

John McRae, Employee

M. L. Hall, Employee

Mt. Pleasant, Michigan

Luman Burch, Broker

Rose Marie Hagen, Employee"

Then follows list No. 3 of 26 credit checkers and collectors in different towns in the States mentioned. List No. 4 relates to occasional attorneys.

The premium for the bond was based or computed upon this list of employees and amounted to $2,311.16 for the first year. The premium for the second year, by reason of the reduction of the number of employees, was $1,723.21.

In the declaration as amended it is alleged that the plaintiffs and each of them were engaged in the business of discounting and purchasing promissory notes given for a part of the purchase price for motor vehicles and secured by conditional sale agreements or chattel mortgages on motor vehicles, and in said business employing various persons to investigate the facts pertaining to the trustworthiness and credit of the makers of said notes and the existence, ownership, possession, and other relevant facts pertaining to the motor vehicles securing said notes, and were desirous of obtaining indemnity against loss of money and/or securities through any dishonest act or acts of any of the plaintiff's employees whether acting alone or

in collusion with others; that plaintiffs were then and have ever since continued to be engaged in the business of purchasing and discounting secured promissory notes and holding the same for investment and collecting said notes, repossessing, only where necessary, the motor vehicles securing such notes and selling, exchanging and disposing of such motor vehicles so repossessed; and neither the plaintiffs, nor either of them, have sold any notes or securities or engaged in the business of buying or selling of securities; and that the defendant made and executed its blanket bond or guaranty policy, and for a good and valuable consideration, paid to it by the plaintiffs, delivered the same to the plaintiffs, and thereby then and there in and by said blanket bond or policy guaranteed to indemnify the plaintiffs and each of them against the direct loss of any money or securities, or both, through any dishonest act of any of the employees of the plaintiffs or either of them, whether acting alone or in collusion with others, which said blanket bond or policy together with the riders thereto attached is as follows, to wit: (Here the bond and riders are set out in *haec verba.*)

It is further alleged that the employees covered by said bond were specified in a certain letter written by the plaintiffs to the defendant, a copy of which is attached to the declaration and made a part thereof; that thereafter, while said bond was in full force, one Luman Burch was in the employ of the plaintiffs to aid the plaintiffs in, and to investigate the facts and make recommendations in respect to, the purchase from regular dealers in motor vehicles of promissory notes given for a part of the purchase price for such motor vehicles and secured by reservation of title thereto in a conditional sale agreement, and said Burch well knew that the plaintiffs desired to purchase only promissory notes signed by persons of law-

ful age and good credit standing and in actual possession of the motor vehicle described in the conditional sale agreement securing such note, such note being a first and valid lien on such motor vehicle; yet, said Burch conspired with C. C. Ruhle, Frank H. Quinlan and Robert Burns (the said Ruhle and Quinlan each being a dealer in motor vehicles), and each of them, to procure, by means of false representations and other dishonest acts, money and securities from the plaintiffs, and pursuant to such conspiracy did unlawfully and dishonestly devise and put into practice a scheme and artifice to so defraud the plaintiffs by procuring the signatures severally of divers persons to contracts for the purchase of automobiles from said Ruhle or said Quinlan and promissory notes evidencing the purchase price and conditional sale agreements securing payment thereof, which automobiles were not owned or possessed by the person or persons purporting to sell the same, the description thereof in each case being entirely false, erroneous and fictitious, and the person in each case signing the contract as purchaser knowing that the automobile named therein was not to be delivered or sold to him, nor was he expected to pay for such supposed automobile, the sole reason for the signatures on said contracts, notes and conditional sale agreements being to permit and enable said Luman Burch and his said coconspirators to use such contracts, notes and conditional sale agreements, respectively, so signed, as a basis and means of dishonestly obtaining money and securities from the plaintiffs; and the said Luman Burch, in each such case, forwarded by mail to the plaintiffs or to one of them the said contract for purchase, conditional sale agreement and promissory note, well knowing the same to be false, fictitious and fraudulent and without consideration and not bona fide, and forwarded therewith a draft on the plaintiffs for the purchase price for such prom-

issory note and conditional sale agreement and a statement in writing and recommendation signed by the said Luman Burch, containing a description of the motor vehicle on which such note was secured, representing that the purchaser and maker of the note was in each case of lawful age, and a person of good standing in the community, a good credit risk, had the financial ability to pay the obligation therein forwarded, and was in actual possession of such motor vehicle, and also furnishing names of responsible persons as the source of his (said Burch's) information; that in each such case said Burch well knew that said representations and each of them made by him to the plaintiffs were false, and that the persons whose names were given as the source of his information were not consulted by him in reference thereto, and that said representations were given for the sole purpose of enabling the said Burch and the said persons so conspiring with him to obtain money and securities from the plaintiffs; that the plaintiffs or one of them received said promissory notes, conditional sale agreements, statements and representations, and in reliance on the genuineness thereof and the truth of the representations therein contained, honored the said drafts for the purchase price, paying said purchase price in each case in cash or in securities consisting of bank drafts commonly known as exchange, which money and securities thereby were obtained by the said Burch, Ruhle and other persons so conspiring with them to cause the plaintiffs or either of them to lose said moneys and securities and by means of the said dishonest acts of the said Burch the plaintiffs in each case lost the said money and securities so paid in honoring said drafts; the name of the supposed purchaser and maker of such promissory note, the date thereof, the amount of money or securities obtained therefor, from, and lost by, the plaintiffs, being in each case as follows, to wit: (Here

follows a list of 66 fraudulent transactions resulting in a loss to appellee of more than $35,000.)

To the amended declaration appellant filed the plea of the general issue and nine special pleas.

The court sustained demurrers to all of the special pleas. Appellant abided by said pleas and a jury having been waived, the cause was tried by the court. All the material facts were admitted by stipulation. On December 15, 1927, Burch and Ruhle were convicted in the federal court for the eastern district of Michigan for using the mails to defraud in connection with the transactions at issue in this case, for which they were sentenced, and the stipulation also provided that the transcript of the testimony in the criminal case in the federal court could be admitted on the trial of this case.

The second, fourth and fifth special pleas alleged in different ways that Burch was not guilty of the conspiracy and other crimes charged in the declaration. The demurrer to these pleas was sustained on the ground that they amounted to the general issue, and we do not understand that any error is now urged on account of the action of the court in this regard. In any event the court admitted all the evidence in regard to the facts alleged in said pleas under the plea of general issue and no harm resulted to appellant by sustaining the demurrer thereto.

The first special plea alleged that Burch was not an employee of appellees but was a broker, and that, therefore, any dishonest acts committed by him were not covered by the bond.

The third special plea alleged that Burch did not receive any of the money or proceeds from any of the transactions but that the money was retained by Ruhle, Quinlan and Burns.

The sixth special plea sets out the rider attached to the bond hereinabove mentioned and alleges that the

losses to appellees arose from the conduct of Burch, who at the time of the alleged dishonest acts set forth in the declaration, was engaged in trading and the buying and selling of the promissory notes purchased by the plaintiffs and referred to therein.

The seventh special plea contains the same averments as set out in the preceding plea but also alleges that at the time and times mentioned in the declaration relating to the purchase of promissory notes by appellees and prior and subsequent thereto that the American Investment Co. was engaged in trading and particularly was engaged in buying and selling promissory notes and in buying notes and selling the same to the American Banking Co., and that the American Banking Co. was engaged in trading and particularly was engaged in the buying and selling of promissory notes and in selling the same to the American Investment Co., and that said losses complained of arose while the appellees or one of them was engaged in trading and in the buying and selling of promissory notes.

The eighth special plea alleges that the losses to appellees were a result of the fictitious trading of Ruhle, Quinlan and Burns and the alleged dishonest acts of Burch in connection therewith.

The ninth special plea alleges that the losses complained of resulted from the trading of appellees and the said Ruhle, Quinlan and Burns and the dishonest acts of Burch.

With the exception of the third special plea, it is apparent that the remaining special pleas, to wit: the sixth, seventh, eighth and ninth, involve mostly questions of law relating to the legal construction of the contract and that such questions of fact as might possibly be involved herein could be (and in fact were) admitted in evidence under the plea of the general issue. As to the third special plea it sets out no defense what-

ever because it would be immaterial whether Burch received any of the money or securities procured as a result of the conspiracy to defraud. The court did not err in sustaining the demurrers to these last mentioned pleas and to avoid a repetition of the discussion of the matters sought to be established by them, which will be hereinafter considered, no further comment in regard thereto will be made at this time.

The proofs show beyond all reasonable doubt that Burch entered into a conspiracy with Ruhle and others to defraud appellees of their money. His culpability is substantiated to a great extent by his own confessions and admissions in his testimony given in the federal court. The *modus operandi* of the conspiracy is disclosed by the stipulation of facts, which, in so far as the errors presented by this appeal are concerned, it is necessary to consider, and is substantially as follows:

"1. That the Purchasers' Statements, and Conditional Sales Contracts in form hereto attached as Exhibit 'A' used in connection with the several time credit deals enumerated in the first count of the declaration were filled out by C. C. Ruhle who was the automobile dealer at Coleman, Michigan, from whose purported sales the several deals originated; that in each such transaction the Purchasers Statement and Conditional Sales Contract after being prepared by Ruhle (or by someone at his direction) was signed by the purported purchaser; that Luman Burch filled in the blanks in the 'Recommendation' on the reverse side of the Purchasers' Statement and in each instance represented that he had investigated the credit standing of the Purchaser and had consulted the references contained in the Purchaser's Statement and in each case quoted the parties referred to as considering the Purchaser in substance as prompt pay or a good credit risk; that Luman Burch did not in fact investigate the credit standing of any such purchaser and did

not consult the persons or bank as credit references and that the statements ascribed to such persons or bank were substantially false and the purchasers were not in fact good credit risks.

"2. That the purporting automobiles described in said several Conditional Sales Contracts and Purchasers Statements were fictitious and nonexistent or had been sent to some other territory and in no case had been delivered to the purporting purchaser in such Conditional Sale Contract except as to deals numbered 26, 32, 34, 45 and 61, of said first count of declaration in which excepted instances the automobile had been previously sold or pledged to some other person so that the Conditional Sale Contracts in question did not create any valid interest in or lien thereon, and even in such excepted cases said Burch made no investigation as to credit standing or references.

"3. That the said Purchasers Statement and Conditional Sale Contracts were delivered by said Ruhle to said Burch and the completed papers delivered by Burch to Ruhle with a draft filled out and signed by Burch drawing on the American Investment Company of Illinois (and in a few cases on American Banking Company) for the sale price of the paper; the papers with the draft attached were then deposited by Ruhle to his credit in his local bank which in turn forwarded the papers to Plaintiff's bank in Springfield, Illinois, where the papers were received and the draft honored and paid by Plaintiffs; in two instances, however, draft was indorsed by Ruhle and left with Burch who then deposited the same to his own credit in a Mt. Pleasant Bank; that Coleman, Michigan, where Ruhle had his place of business, is nineteen miles distant from Mt. Pleasant, Michigan, where Burch lived and had his insurance office.

"4. Plaintiff as at the time of purchase of said papers sustained net losses on each of said transactions in the sum placed opposite the names of the

makers and dates of said Conditional Sale Contracts in the first count of the declarations.

"5. Either Plaintiffs or defendant may offer in evidence any of the testimony or exhibits offered in evidence in the case of People of the United States vs. C. C. Ruhle, Luman Burch, Robert Burns, et al., in the United States District Court for the Eastern District of Michigan, in like manner as if the particular witnesses testified or exhibits were offered in this case subject only to any objections as to relevancy or competency, waiving all objections as to forms; . . .

"7. That the residence of the purporting purchasers in said Conditional Sales Contracts was in each case six or more miles distant from the City of Mt. Pleasant, Michigan, and in most cases at Coleman, Clare and Rosebush, Michigan, respectively nineteen, fourteen and seven miles distant from Mt. Pleasant, Michigan.

"8. Either party may offer additional evidence on the trial of said cause.

"9. That at the time of the transactions here involved American Investment Company of Illinois was, and still is, a Delaware corporation authorized to transact business in the states of Illinois and Michigan, and engaged in the business of purchasing time payment paper given for the purchase price of motor vehicles secured by conditional sale agreements and other liens thereon; and the American Banking Company was a banking association organized under the laws of Illinois, all the stock thereof, except shares to qualify its officers, being owned by said American Investment Company of Illinois; and that paper so acquired by the American Investment Company of Illinois was held by it for collection and none of said paper or conditional sale agreements were sold by said American Investment Company of Illinois, or by said American Banking Company.

"10. That the defendant United States Fidelity and Guaranty Company, a corporation of Maryland,

executed and delivered to the plaintiffs the blanket bond or guaranty policy, together with the riders following the same, set forth in the first count of said declaration; that the employees, brokers and subbrokers of the plaintiffs alleged to be covered by said policy were specified in a letter of July 13, 1926, written by A. E. Ryan, secretary of each of the plaintiffs, to the general agents of said defendant (a true copy of which letter is attached to the declaration herein, and the original of which was duly received by the defendant;) that all premiums and rates quoted by the defendant were paid by the plaintiffs for said policy, and said policy continued in full force until terminated by written notice given by the defendant to the plaintiffs dated October 26, 1927, under section 12 of said bond or policy.''

Burch was originally employed under a written contract dated April 1, 1926, as a subbroker under Curtis & Clark, Inc., to solicit and procure from automobile dealers conditional sale contracts evidencing the purchase price of motor vehicles and secured by first lien thereon, and to submit the same for purchase to appellees, he to receive a commission of one-half per cent of the face amount of the paper purchased and also one and one-half per cent on collections. The contract with Curtis & Clark provided that he agreed under instructions from Curtis & Clark, Inc., to solicit and procure from automobile dealers promissory notes of purchasers of motor vehicles secured by a first lien upon automobiles and submit the same for purchase by the company, all to be upon such forms and upon such terms and conditions as the company may from time to time direct. This written contract commences as follows:

''THIS CONTRACT, made April 1st, 1926, by and between CURTIS & CLARK, INCORPORATED hereinafter for brevity called the 'Company' and LUMAN BURCH hereinafter for brevity called the 'Broker,' WITNESSETH,

That:" The evidence further shows that through some agreement between Curtis & Clark, appellees and Burch the latter acted as the local agent for appellees working directly for them and that the drafts and contracts connected with the purchase of the automobile notes were received by appellees directly from Burch and not through Curtis & Clark. He was furnished with certain forms to be used in the purchase of said notes. On the reverse side of each form was a recommendation form to be filled in and signed by him. The following is an example of one of the fraudulent recommendations made by Burch:

"RECOMMENDATION FORM
(For Use by Representative)
Dated at Mt. Pleasant, Mich., Dec. 10, 1926

Name of Applicant Wm. Barnhart.

Do you personally know Applicant? Yes.

Have you investigated his Credit Standing? Yes.

Give general character or reputation of district or neighborhood in which Applicant lives. Good. Is employed? Yes.

What is the nature of the information obtained from references? (Give in detail.)

1. State Bank of Coleman: Good credit account. Takes care of paper promptly.

2. James Carty, Grocer, Coleman: Good pay. Generally cash.

Remarks:

(Giving delivered price, down payment and unpaid balance)

. . . . . .

Is he of legal age? Yes. Is he an habitual user of intoxicants? No. Is he an employee or Proprietor of Soft Drink Parlor? No. Has he a Police Record? No. How does he pay his obligations? Prompt. Do you recommend the loan? Yes. First class paper. Makes big money. Luman Burch, (Representative)."

The first point made in the argument of appellant is: "The bond sued on does not cover all loss or dam-

age sustained through a dishonest act, but is limited to the loss of specific, tangible property of the kind specified, namely, securities or money, as those terms are defined in the bond. It only covers the loss of certain physical things. It does not cover a loss occasioned by the insured being induced to invest in a security which afterwards proves worthless.''

Counsel for appellant argue at great length that the bond only contemplated losses arising by reason of loss of *securities* after the assured had obtained the securities and not losses arising out of a transaction involving the obtaining or purchase of securities or obtaining securities as collateral to notes purchased by the assured, and that a recovery cannot be had under the bond by showing that the assured suffered the loss, not by the loss of the security, but by taking of a security which due to its fictitious nature turned out to be worthless, because appellees never lost the notes or fictitious chattel mortgages or conditional sales contracts but still have the notes, mortgages and contracts. However sound this contention may be, it ignores the fact that the bond insured appellees against the loss of *money* by reason of any dishonest act by one of its employees. Burch not only shared with his coconspirators in the money paid by appellees for the fictitious securities in question but also fraudulently obtained from appellees his commissions on the fictitious transactions. There is little difference in principle in obtaining money from a person by fraud than by larceny. In either case it is a dishonest and criminal act.

It is also contended that no recovery can be had because the bond provides that appellant is not responsible for any loss resulting directly or indirectly from *trading* actual or fictitious, whether in the name of the insured or otherwise. The word ''trading'' ordinarily implies a purchase and sale. In this case nothing was bought and nothing was sold by Burch nor his coconspirators. It is admitted in the stipulation of facts

that appellees did not buy these securities for the purpose of selling the same and did not sell them but simply purchased them for an investment. Crime has not yet been dignified by the name of trade. If this rider should be given the construction sought to be placed upon it by appellant, then it would practically annul all the provisions therein for the protection of the assured. Appellant, however, has placed its own construction on the coverage extended by the bond. In its letter to appellees of June 3, 1926, which has been heretofore referred to, it states, ''The salient point of this coverage is as follows: Covers direct loss. Covers *any dishonest act of any employee.* Covers business in which the insured has a pecuniary interest, or held as collateral, or held as bailee or trustee or agent whether legally liable or not.'' The bond itself states that appellant agrees to indemnify appellees in the loss of money or securities or both in which the insured has a pecuniary interest in an amount not exceeding $25,-000 through any dishonest act of any of the employees, as defined at section 6 thereof, whether acting alone or in collusion with others. Where two provisions in an insurance policy or bond are antagonistic and inconsistent with each other, that provision will be enforced which favors the protection of the insured.

It is also urged that Burch was a broker and not an employee and therefore not covered by the bond. In the letter of June 3, 1926, written by appellant to appellees it said: ''In a copy of your letter of November 21st, 1925 to the Integrity Mutual, you have divided the representatives of your company in the following manner:—1. Employees (salaried force) 2. Agents (commission men) Sub-agents (commission men) 3. Representatives 4. Occasional Attorneys.

''In checking over your list of the ones located in your home office here in Springfield, which are the ones on the salaried basis, you have added the name of Mr. F. E. Coble. This will make fifty-three (53)

employees under class No. 1; sixty-five (65) under class No. 2; making a total of 118. This number enters into the basic make-up of your Bankers Blanket Bond rate.

"Under class No. 3 you have forty-six (46) representatives, and under class No. 4 there are, I believe, fifty (50) occasional attorneys indicated. . . .

"Basing the cost of Bankers *Blanket* Bond form No. 2 on the above factors of exposure, and the number of employees, agents, subagents, representatives and occasional attorneys indicated in your file which you were good enough to let us have, the final bond computation is, and arrived at, as follows:

Class Nos. 1 and 2:

Twenty-five (25) employees .........$625.00
Twenty-five (25) employees (26 to
   50) @ $15.00 ea. ............... 375.00
Fifty (50) employees (51 to 100)
   @ $10.00 ea. ................... 500.00
Eighteen (18) employees (101 to 200)
   $5.00 ea. ..................... 90.00

Basic rate ....................$1590.00
Adding 25 per cent over basic rate
   for form No. 2 ............... 397.50

$1987.50"

In this letter appellant also states: "We are attaching hereto Bankers Blanket Bond application which we will please ask you to complete in its entirety. *** Will you please give us a memorandum supplementing application, indicating character of business carried on by your parent and subsidiary companies.

"We wish to have a list of your employees, both salaried force and commissioned." In compliance with the above letter appellees by their letter of July 13, 1926, divided their representation of employees as follows: "1. Employees (salaried force) 2. Brokers

(commission men) Sub-brokers (commission men) 3. Credit Checkers and Collectors 4. Occasional Attorneys." Under classification No. 2, "Brokers" and "Sub-brokers," 31 persons are listed including the name of "Luman Burch, Broker." Upon this entire list of employees the premium paid by appellees for the policy was computed. Appellant accepted this list without objection to the fact that any of the named persons therein were designated as brokers. In our opinion it makes little difference whether Burch was called an employee, agent or broker, provided he performed the duties of an employee or was recognized by the parties as an insurable risk under the bond. In the contract between Burch and Curtis & Clark, Inc. it is stated that he is called "Broker" for "brevity." In any event, appellant accepted Burch and 30 other persons designated as "Brokers" as coming within the meaning of the term "Employees" as used in the bond.

The bond with the application and the correspondence between the parties show conclusively that occasional attorneys who might be employed by appellees were also covered by the bond and classified as employees. In the letter of June 3, 1926, in discussing what the premium might be appellant states, "Class four is made up of occasional attorneys bonded to the American Banking Company, et al. This coverage is extended to cover fifty (50) attorneys who might be employed from time to time by your company. A coverage extended in the amount of $500.00 only on each of the fifty occasional attorneys. The rate per $100.00 per attorney is $.30. Premium based upon $500.00 only on each attorney for fifty attorneys will be $75.00." In response to this letter appellees in their letter or supplemental application dated July 13, 1926, under the subject of "Occasional Attorneys" state: "We understand that under this classification, we are

protected under the coverage of our bond on any occasional attorney used by us in collection matters, in the amount of $500.00. We also understand that it is not necessary to specifically list the attorneys under this classification, owing to the fact that we do not expect to use as many as 50 attorneys at any one time.''

It is thus conclusively shown that occasional attorneys were accepted as employees within the terms and meaning of the bond and there would be no more reason for holding that Burch, who was nominally listed as a ''Broker'' and personally named, should not come within the provisions of the bond than an ''Occasional Attorney'' who was not even individually named.

The next point contended for by appellant is that the evidence showed that the suspicions of appellees were aroused prior to some of the losses and that they could have prevented the losses by taking reasonable precautions. It is true that the suspicions of appellees were aroused from the fact that Ruhle was apparently selling a very large and unusual number of cars and they wrote to Burch to investigate different transactions and each time Burch replied in a way which tended to allay these suspicions. In regard to one transaction Burch wrote to appellees as follows: ''This party first asked this new contract on the Farmers Plan as he has a big crop of beets this year and no doubt will pay up this contract by Feby. . . . This is No. 1 paper.'' This statement was entirely false. In regard to another transaction he replied to appellees in the following manner: ''This party is O. K. for this car. He and his father own this business and are doing a fine business. Car good security.'' All of which was false. The record contains many other such instances. On December 3, 1926, appellees wrote to Burch in regard to Ruhle selling too many cars in which they stated: ''If we did not have considerable

confidence in your ability to select and purchase good paper, we believe we would cut out this dealer's account altogether."

The evidence shows that as late as February 16, 1927, appellees still retained confidence in Burch's integrity, but in the spring of 1927 they instituted an investigation which resulted in the disclosure of the true state of facts and the collusion of Burch, Ruhle and others. In view of the above facts the claim that appellees were guilty of laches is without merit.

It is further contended that under the terms of the agreement between Burch and appellees the former was not required to make a personal investigation in regard to the makers of the notes and his failure to do so was not a dishonest act. In answer to this contention the evidence fairly tends to show that it was his duty to make such investigations and report truthfully the result thereof. He never at any time claimed that such was not his duty nor refused to do so. He fraudulently pretended to make such investigations and made false reports as a result thereof. It makes no difference whether it was his duty to make such investigations if in fact he pretended to do so and made false reports to appellees for the purpose of defrauding them of their money. In such case he was guilty of a dishonest act whether it was his duty to make such investigations or not.

Finally it is suggested that the court erred in admitting incompetent evidence over the objection of appellant. The particular evidence objected to is not pointed out and we have no means of knowing what evidence appellant claims was incompetent. In any event, however, the trial was had before the court without a jury and the court is presumed to have considered only the competent evidence.

We find no reversible error in the record and the judgment of the circuit court is affirmed.

*Affirmed.*