[Civ. No. 7888. Second Appellate District, Division One.—May 7, 1934.]

WILLIAM JARVIS EARL, Respondent, v. FIDELITY AND DEPOSIT COMPANY OF MARYLAND (a Corporation), Appellant.

436

Joe Crider, Jr., for Appellant.

William M. Rains for Respondent.

HAHN, J., *pro tem.*—Defendant appeals from a judgment rendered against it for the sum of $10,085 upon a "broker's blanket bond" issued by defendant to plaintiff, to indemnify him against any losses suffered by him through certain prescribed acts of his employees in the brokerage business in which he was engaged in the city of Los Angeles.

The provisions of the surety bond in question which are material to the points raised on this appeal read as follows: "In consideration of the premium of Eleven Hundred and 00/100 ($1100.00) Dollars, paid by Wm. Jarvis Earl & Company, hereinafter referred to as the Insured, to the Fidelity and Deposit Company of Maryland, hereinafter referred to as the Underwriter, . . . the Underwriter hereby undertakes and agrees to indemnify the Insured, and hold it harmless from and against any loss, to an amount not exceeding twenty-five Thousand and 00/100 ($25,000.00) Dollars, of money, currency, bullion, bonds, debentures, scrip, certificates, warrants, transfers, coupons, bills of exchange, promissory notes, checks, warehouse receipts, bills of lading, or similar securities, in which the Insured has a pecuniary interest, or held by the Insured as collateral, or as bailee, trustee or agent, . . . sustained by the Insured . . .

"(a) Through any dishonest act of any of the Employees wherever committed, and whether committed directly or by collusion with others.

"(b) Through larceny, whether common law or statutory, robbery, burglary, holdup, theft, or other fraudulent means, . . .

"This bond does not cover— (f) Any loss directly, or indirectly from trading, actual or fictitious, whether in the name of the Insured or otherwise, and whether or not within the knowledge of the Insured, and notwithstanding any act or omission on the part of any Employee in connection therewith, or with any account recording the same."

In plaintiff's employ was one R. V. Kessler, who, as "head customers' man", had authority to confirm and put through customers' orders, when such orders were executed on the New York Stock Exchange. Another employee was Fred T. Lane, who as cashier had general oversight of customers' accounts and also had authority to confirm and direct the execution of customers' orders. A third employee was one W. C. Gatlin, who, as a "customers' man", was engaged in securing customers' orders. Such orders required the confirmation of either plaintiff, Kessler or Lane before they were accepted and executed.

About October 15th, Gatlin brought one Louis Stein into plaintiff's place of business and introduced him as a prospective customer. Stein signed a margin card which was placed in the customers' files for use in connection with any orders Stein might place with the house. He was represented by Gatlin as a heavy trader whose business would be a valuable acquisition for the house, if secured. On the morning of October 17th, Gatlin came to plaintiff with an order from Stein for the purchase of 1,000 shares of International Telephone and Telegraph stock at $124 per share. As this purchase was to be made on the New York Stock Exchange, it would have had to be executed through some broker who had New York Stock Exchange connections. When plaintiff was advised by Gatlin that no money had been put up on the order by Stein, plaintiff refused to o. k. the order and told Gatlin, "You go get the check and then if it is good, I will be glad to o. k. the order." Later the same morning, Gatlin went to Kessler with the request that he put through the Stein order. Concerning this episode Kessler testified: "Mr. Gatlin came to me with a buy order for 1000 shares of International 'Phone for Mr. Stein's account. I told Mr. Gatlin I couldn't put it in because there was no money up. I knew that there had been no money put up, and that he would have to get Mr. Earl to o. k. it, and he left my desk. . . .

Mr. Earl was standing possibly ten feet behind me at the telephone desk, and Mr. Gatlin went to Mr. Earl, and I didn't hear what they said, and then Mr. Gatlin came back to me and threw the order on my desk and said, 'O. k.' and I said, 'Did Mr. Earl say it was o. k.? and by that time Mr. Gatlin had walked over to a chair by Mr. Stein, and he turned around and hollered back, 'Yes, o. k.,' so I put the order in. . . . ''

Stein and Gatlin remained in plaintiff's board room awaiting word as to the execution of the order. When about 12 o'clock noon, the closing time of the New York Exchange, no word had been received that the stock had been purchased, Stein canceled the order. As Stein and Gatlin were about to leave plaintiff's office shortly after 12 o'clock, Gatlin went to Kessler, and said, ''We are going to buy 200 shares at the opening in the morning.'' Whereupon Kessler wrote out a new buy order for 200 shares of International Telephone and Telegraph stock at 124, which he advised Gatlin and Stein he would put through early on the following morning. The next morning Kessler put through the 200 share buy order and in due course Stein and Gatlin, who were in plaintiff's office waiting for word as to the execution of the order, were advised that the 200 shares had been secured at 123⅜. After a few minutes of conference between Stein and Gatlin, Gatlin went to Kessler's desk, wrote out an order to buy 800 shares of International Telephone and Telegraph stock, and after signing the name of ''Lou Stein'' to the order in the presence of Kessler, handed the order to Kessler for execution. This order for 800 shares was immediately put through and Stein advised of the purchase.

Fred T. Lane, plaintiff's cashier, testified that about 11 o'clock on the morning of October 18th, after both purchase orders had been put through, he went to Gatlin and told him to get a check from Stein for $38,000, which was the margin the house required on the two orders. Gatlin replied that he would secure the required check. Shortly after this conversation with Gatlin, plaintiff learned for the first time from his cashier Lane that the stock had been purchased for Stein. Plaintiff at once went to Gatlin, and according to plaintiff's testimony the following conversation took place: ''I told Mr. Gatlin to get a check on this

account right away, and he said he would, and he asked me if it would be all right if he got one that evening and brought it down in the morning and I said, 'No, we want the check immediately,' and he said he would go out then and there and get one. . . . I told him what we wanted him to do and what we expected him to do, and he left shortly after that." Plaintiff, testifying to a conversation with Gatlin later in the afternoon, said, "I met Mr. Gatlin on the street as I was going from the office and he was coming down with the check and in passing he said, 'I have the check, Mr. Earl,' and started to show it to me and I said, 'That is fine Mr. Gatlin; take it right up to the cashier.' "

Gatlin delivered the check, which was postdated October 19th, to Lane, the cashier, and stated that Stein had told him that money to take care of the check would be in the bank on which the check was drawn at 11 o'clock on the following morning, October 19th. When presented for payment at the bank on the following morning, payment was refused. Thereupon plaintiff sold the stock purchased for Stein and by reason of the falling market, the stock sold for $10,085 less than was paid for it when purchased. To recover this loss, plaintiff brought this action against defendant on the "blanket brokers' bond" hereinbefore referred to.

During the trial, plaintiff called to the stand two witnesses who were engaged in the brokerage business who were characterized by plaintiff's counsel as "expert witnesses". To each was propounded what was termed a hypothetical question, which consisted of a recital of the testimony of plaintiff's witnesses as to the conversations and events relating to the Stein orders and their execution. At the close of this recital the witness was asked "Assuming all of the foregoing facts to be true, have you an opinion as to whether or not the loss of the sum of $10,085 resulted directly or indirectly from trading actual or fictitious; if so, what is that opinion?" Over defendant's objections, both witnesses were allowed to express an opinion, which in each instance was in the negative.

In urging a reversal of the judgment, appellant places its main reliance on the contention that the loss suffered by plaintiff was clearly shown to have resulted "from trading", and that defendant had specifically excepted such

losses from its liability under the policy in the following paragraph: "This bond does not cover—(f) Any loss directly or indirectly from trading, actual or fictitious, whether in the name of the Insured or otherwise, and whether or not within the knowledge of the Insured, and notwithstanding any act or omission on the part of any Employee in connection therewith, or with any account recording the same."

That the loss was one suffered in a trading transaction cannot successfully be disputed. It is true two of plaintiff's witnesses, in response to hypothetical questions, over defendant's objections testified in their opinion that the loss was not suffered directly or indirectly from trading, but these opinions were erroneously admitted by the court. The question propounded to these witnesses was one for determination by the court and not a proper question for a witness' conclusion. If the issue involved was that the word "trading" as used in the bond had a limited or peculiar meaning when used by brokers and bonding houses in the writing of such indemnity policies, it would have been proper to have offered the testimony of some qualified witnesses to show such meaning. The hypothetical question called for a widely different answer than that which would have been proper in showing the accepted meaning of the term when used under the circumstances here involved.

In the absence of any evidence showing the term "trading" was used in other than its common meaning, there would seem no escape from the conclusion that the transactions here involved came within the ordinary meaning of the term.

Respondent places his main stress upon the contention that the loss was caused by the "fraud and dishonest act" of Gatlin in that he represented to Kessler that plaintiff had o. k.'d the first 1,000 share buy order, when in truth plaintiff had refused to o. k. the order without a margin check from Stein. This contention of respondent in nowise answers the argument that the loss was one incurred in trading.

In the case of *Harris* v. *National Surety Co.,* 258 Mass. 353 [155 N. E. 10], a situation similar to that here involved was before the court. Plaintiff, who was in the brokerage business, had secured from defendant a "broker's blanket

bond" to cover all his employees. The bond contained a paragraph identical in every respect with that here involved, which excepts trading losses from the liability of the bond. One Jacobs, an employee of plaintiff, opened a trading account with plaintiff in the name of Susan M. Collins. All orders for buying and selling on the account were given by Jacobs, as the ostensible agent of Susan M. Collins. He secured surreptitiously the monthly account statements issued by the house to Susan M. Collins.

After carrying the account for some months, the margin became insufficient and the securities then in the account were sold at a loss to the account of $6,975. It was then discovered that Susan M. Collins was a fictitious name under which Jacobs had been operating for his own account. Plaintiff filed action against the bonding company for the amount of the loss on the theory that the loss was caused by the dishonest acts of Jacobs in using the fictitious name under which to operate for his own account.

The court, admitting that the conduct of Jacobs was dishonest and fraudulent, so far as his employer was concerned, held that the loss was one suffered in trading and under the exception clause, the bonding company was not liable.

The reasoning as also the conclusion of the court in the recently decided case of *Security Trust & Savings Bank of San Diego* v. *New York Indemnity Co.*, 220 Cal. 372 [31 Pac. (2d) 365], gives support to our conclusions on this point. There the indemnity bond excepted from the liability assumed, "losses effected directly or indirectly by means of forgery", and "any loss resulting from any loan made by the insured". A loan was made to one Howard, who, in making representations which induced the loan, committed forgery, and, as stated by the court, acts which clearly constituted theft as defined by our Penal Code. Losses by theft were specifically covered by the bond. Notwithstanding the declared criminality of Howard's acts in obtaining the money, the court held the bonding company was not liable under its bond because of the exceptions provided for in the bond.

The evidence in the instant case would seem the more readily to bring it within the exception clause than the case just referred to, for there is not sufficient evidence

in this case to justify a finding that Gatlin was guilty of any of the crimes specified in the bond.

Still other considerations would seem to militate against respondent's position. First, it clearly appears that the 1,000 share order in connection with which Gatlin made the misrepresentation was canceled and was never in fact executed. There is no evidence that Gatlin made any misrepresentation in connection with the 200 and 800 share buy orders. Kessler had full authority to put through these orders without any o. k. from plaintiff. That Kessler may have assumed that if plaintiff approved the 1,000 share buy order without a margin check, he would have approved the 200 share buy order, does not justify the implied finding that the misrepresentation was made in connection with the orders actually executed, or that the loss resulting from the two purchase orders was caused by Gatlin's misrepresentation in connection with an order never executed.

Another factor which weakens respondent's contentions arises from the fact that after plaintiff learned that the two orders had been executed on the following day, he seems to have sanctioned the purchase without first securing a margin check, by directing Gatlin to go and get a check from Stein. This Gatlin at once proceeded to do as ordered and upon returning with a check, plaintiff commended Gatlin's accomplishment and directed that he take it to Lane, the cashier. When it was handed to Lane, he observed that it was postdated and only for $25,000. Gatlin explained that Stein said he would have the money in the bank on which the check was drawn at 11 o'clock the next morning, and that Stein would send a check for the remaining $13,000 to make up the margin requirement the following morning. The check and the explanation were accepted by Lane, who as cashier had full authority in such matters. This conduct on the part of Earl and Lane fairly justifies the inference that plaintiff had decided to waive or condone Gatlin's conduct in misrepresenting Earl's attitude regarding the 1,000 share purchase order and go through with the two purchase orders as they had been made.

From the foregoing it follows, and we so decide, that the findings that plaintiff was not engaged in trading; that the acts of Gatlin in connection with the purchase orders were

perpetrated with the intent to defraud plaintiff; that the loss suffered by plaintiff was caused by the fraudulent acts of Gatlin; that Louis Stein did not place any orders for the stock purchased but that the same were fraudulently placed by Gatlin, do not find support in the evidence.

For the reasons indicated, that the evidence fails to support the findings and judgment, and the errors of the court in overruling defendant's objections to the hypothetical questions, the judgment must be reversed. It is so ordered.

Houser, Acting P. J., and York, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 6, 1934.