## LEVEY v. JAMISON.

### No. 3927.

Circuit Court of Appeals, Fourth Circuit.

April 6, 1936.

J. Spencer Bell, of Charlotte, N. C., for appellant.

John H. Small, Jr., of Charlotte, N. C., for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

The trustee in bankruptcy of Schluter, Green & Co., a North Carolina corporation, recovered a judgment in the District Court for $9,607.55, with interest, against the receiver of the National Surety Company based upon the alleged breach of a surety bond wherein the bankrupt was insured against losses through dishonest or criminal acts of its employees. Prior to April 1, 1933, the bankrupt had been engaged for three or four years in the stock and bond brokerage business at Charlotte, N. C., having been furnished with the capital sum of $10,000 by a Mr. Schluter of New York. According to the testimony of the office manager, the business was that of a bucket shop. In a number of instances, money, or securities received from customers with specific instructions were not applied as directed and the accounts were more or less juggled. Payments from the bank account of the bankrupt were sometimes made to customers on fictitious transactions. The business lost ground during the period, and during the last year the books were hopelessly confused and the company was bankrupt. After bankruptcy, claims of customers were filed against the estate in the aggregate sum of $9,607.55 with interest, and

these claims involve the identical transactions on which the pending suit is based.

The question for determination is whether these claims represent losses of the bankrupt within the terms of the bond. Amongst the losses covered thereby against which the bankrupt was protected and insured was any loss, including loss of property, through any dishonest or criminal act of any employee; and property was declared to include amongst other things, money, bonds, certificates of stock, and all other similar instruments, in which the insured had a pecuniary interest, or which were held by the insured as collateral or as bailee, trustee, custodian, agent, or in any other capacity, and whether or not the insured was liable therefor.

It was alleged in the complaint that Leonore Seay was employed by the bankrupt company as office manager with authority to take orders for the purchase and sale of securities and to sign checks on the company's bank account, and that taking advantage of her opportunities, she had fraudulently and willfully misapplied and embezzled money and property intrusted to her as its employee and agent. Ten transactions, which occurred in the latter part of 1932 and the early part of 1933, were specifically listed in the complaint, and it was charged that in each transaction the manager had fraudulently and willfully embezzled and converted to her own use, or for the benefit of others not entitled thereto, certain funds of a customer which had come into her hands as agent for the house. In some instances it was alleged that the money was paid to her for the purchase of stock; in others that it was received from the sale of stock or bonds intrusted to her by the customers and sold with or without their permission; and in all that the proceeds were misapplied and embezzled as aforesaid so that the customer, together with the company, sustained a loss. The total of the moneys involved in these transactions was $9,607.55 with interest from the respective dates on the several sums for which the suit was brought.

If these allegations are found to be sustained by the proof, the judgment of the District Court should be affirmed. It is true that we are not dealing with a contract which covers a loss suffered by a person not a party to the contract and authorizes suit in his name, such as the automobile liability policy described in State Farm Mutual Auto. Ins. Co. v. James (C.C.A.) 80 F.(2d) 802. The person protected against loss in this case is Schluter, Green & Co. But the loss insured against includes the loss of property, and property is defined as money, stocks, and bonds in which the insured has a pecuniary interest, or which the insured holds as bailee, agent, or custodian and whether or not the insured is liable therefor. We have, therefore, no occasion to consider the distinctions between loss and liability insurance; and it is no defect in the suit that it is brought by the insured to recover for the loss of property belonging to strangers to the policy.

Nevertheless it is necessary to inquire whether the loss came about "through any dishonest or criminal act of any of the employees" in the sense in which those words are used in the policy. The only witnesses were the trustee in bankruptcy and the former office manager of the insured. The trustee merely substantiated the claims of the creditors, the loss of the financial records of the bankrupt, and the existence of assets amounting to only a few hundred dollars; and he denied any knowledge of embezzlement on the part of the office manager or acquaintance with the transactions of the business before bankruptcy. The case depends upon the testimony of the office manager. She said that she served both in this capacity and as secretary to the president, and that both of them had authority to sign checks. She supported the charges of the claimant that the moneys and securities of the customers had been misapplied, although she failed in most instances to give the amount of money involved, intending perhaps to adopt the figures given in the complaint. Her testimony, however, leaves uncertain the final disposition of the funds of which the customers were despoiled, and the extent of the participation therein by the president and directors of the corporation. On March 29, 1933, she destroyed the company's books and records for the preceding year and attempted to commit suicide. She left a letter to the president in which she listed the securities owing to customers and expressed abject sorrow over the betrayal of his trust and confidence, saying that not all of the shortage was hers, but that it was all her fault, and that they always spent more money than they had. Her testimony at the trial,

however, differed substantially from her letter. She said that all the persons in the office realized that the business was not making money but thought that the New York office would make up the losses; that the president had access to the bank statement and knew there was a deficit, but did not inquire as to the amount. Specifically she said: "We were running a bucket shop. The liability was caused by dumping all the money into one account and paying out to customers on fictitious trading accounts. Every cent represented by these claims was paid out either for the operating expenses of Schluter, Green, or upon a claim against them by some client of theirs who had given orders which were not carried out and thereby created a shortage. The claims upon which this suit is based are those of the people who came in last to get their money. I did not personally embezzle one cent." Her feeling of guilt was due, she said, to juggling the accounts or using money to pay one customer $3,500 which did not belong to him. No further particulars of this transaction were given, and it is impossible to say with certainty whether or not the corporation was indebted to him and paid him with funds which belonged to some one else. There were also salary overdrafts, one by the manager, and one by the president; but the evidence does not show that these were brought about by dishonesty or crime.

The trustee did not present the president or any member of the board of directors or any other employee or stockholder as a witness, or account for their absence; nor were any of the wronged customers put on the stand; and since the burden of proof was upon the trustee to prove not only that the loss was caused under the bond by dishonest or criminal act of an employee, but also the amount of the loss, a directed verdict for the trustee was a mistake. Even if we assume, in the absence of any evidence as to the extent of the authority given to the corporation by their customers, that the handling of their securities and funds as described amounted to dishonesty or crime on the part of the agents of the corporation, and did not merely create an indebtedness running from the corporation to the customers, we still lack definite proof that the insured itself was not a party to the illicit transactions. If we confine our attention to the attempted suicide of the manager in 1933 and the contents of her letter to the president, we conclude that she embezzled at least a part of the customers' money without her employer's knowledge and that a part thereof was used to meet the requirements of a losing business. If we confine ourselves to her sworn testimony in 1935, we learn that she did not take any of the money for herself, but all of it was used either in operating expenses of the business or in meeting the demands of other clients; and if we accept the latter as the more credible explanation, we are still in the dark as to whether the actions of the manager were performed secretly upon her own independent initiative, or were done with the knowledge and consent, implied or expressed, of the governing body of the corporation. In any event, it was essential for the jury to find the facts after taking into consideration all of the testimony in the case.

■ It is manifest that if the jury should find that the corporation itself was a party to the acts complained of, there can be no recovery in this case. The parties to the bond did not mean to insure the corporation against losses which might be caused by its own dishonesty or crime, but merely to protect it against the dishonesty or crime of its employees. A policy of fidelity insurance does not insure an employer against his own fraud. Farmers' & Merchants' Nat. Bank of Verdon v. U. S. F. & G. Co., 28 S.D. 315, 133 N.W. 247, 36 L.R.A.(N.S.) 1152; 14 R.C.L. 443; 25 C.J. 1097; Metropolitan Casualty Ins. Co. v. First State Bank (Tex. Civ.App.) 54 S.W.(2d) 358; Citizens' Guaranty State Bank v. National Surety Co. (Tex.Civ.App.) 242 S.W. 488; Parker v. National Surety Co., 193 Wis. 338, 214 N.W. 361.

For the reasons given, the judgment of the District Court must be reversed and the case remanded for a new trial. Upon such a trial, it may become necessary to take into consideration the provisions of another clause of the bond which specifically provided that the bond should not cover loss, directly or indirectly, in trading, actual or fictitious, whether in the name of the insured or otherwise, and whether or not within the knowledge of the insured and notwithstanding any act or omission on the part of any employee in connection therewith or with any account recording the same. In view of the uncertainty in

which the record before us leaves the transactions that have been described, it is not possible to say whether the clause referred to will have any bearing on the final decision of the case, but reference may be made to the following cases in which it was discussed: Rath v. Indemnity Ins. Co. of North America, 2 Cal.App. (2d) 637, 38 P.(2d) 435; Earl v. Fidelity & Deposit Co., 138 Cal.App. 435, 32 P. (2d) 409; Harris v. National Surety Co., 258 Mass. 353, 155 N.E. 10; compare American Inv. Co. v. U. S. F. & G. Co., 267 Ill.App. 370.

Reversed and remanded.