93 F.2d 810 (1938)
In re SCHLUTER, GREEN & CO.
LEVEY
v.
JAMISON.
No. 4200.
Circuit Court of Appeals, Fourth Circuit.
January 4, 1938.
J. Spencer Bell, of Charlotte, N. C., for appellant.
John H. Small, Jr., of Charlotte, N. C., for appellee.
Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.
SOPER, Circuit Judge.
Upon the former appeal in this case (4 Cir., 82 F.2d 958), it was held that the evidence did not justify a directed verdict for the insured under the bond issued by the surety and the case was remanded for a new trial. Therein certain deficiencies in the evidence were supplied, and in effect a verdict for the insured was again directed. This action, we think, was erroneously taken, although we do not suggest that no liability exists on the part of the surety.
The bond is denominated a banker's blanket bond for private bankers and stockbrokers. *811 It was issued in the sum of $50,000. The insured, which the surety agreed to indemnify and hold harmless against loss, include Schluter & Co., Inc., a New York brokerage house, and its solely owned subsidiary, Schluter, Green & Co., a North Carolina corporation with offices at Charlotte in that state.
The coverage clause upon which the insured relies is as follows: "Any loss through any dishonest or criminal act of any of the employes, including loss of property through any such act of any of the employes, wherever any such act may be committed and whether committed directly or by collusion with others."
Property is defined by the bond to include, among other things, money, bonds, and certificates of stock in which the insured has a pecuniary interest or which are held by the insured as collateral or as bailee, trustee, custodian, agent, or in any other capacity, and whether or not the insured is liable therefor.
The bond also contains the following excepting clause:
"Section 2. This bond does not cover: * * *
"(j) Loss directly or indirectly from trading, actual or fictitious, whether in the name of the insured or otherwise, and whether or not within the knowledge of the insured and notwithstanding any act or omission on the part of any employee in connection therewith, or with any account recording the same."
Schluter, Green & Co., called hereinafter the company or the insured, was organized in 1929 to act as a medium for the distribution of securities underwritten by Schluter & Co., of New York, the parent corporation. The subsidiary was not established to trade in securities on its own account or to handle trading accounts for customers, but did handle some such accounts. The Charlotte office was in charge of Frank Green, vice president of the subsidiary corporation. On March 1, 1930, he employed Leonore Seay, who thenceforth acted in the capacity of his secretary and as office manager of the business. She kept the books of the company, and both she and Green were authorized to sign checks on the company's bank account. At first there were several salesmen but, as the business was not profitable, they were gradually released until in December, 1932, only Green and Miss Seay remained in the organization. His compensation was 50 per cent. of the profit on each transaction and amounted to about $200 per month. Her salary was $115 per month and the office expenses were about $110 per month. For several months prior to April 1, 1933, when the office was closed, the New York house sent approximately $200 per month to meet the expenses. On March 29, 1933, Miss Seay destroyed the books, including the bank statements and checks, finding the books were in such confusion that no one could straighten them out. She then unsuccessfully attempted suicide. In contemplation of death she wrote a repentant letter to Green in which she referred to her betrayal of his trust and confidence and gave a list of ten transactions in which the money or securities of customers had been improperly used, stating that not all of the shortage was hers, although all of it was her fault. Shortly afterward, bankruptcy proceedings were instituted. The trustee found substantially no records of the company's business, a bank balance of trivial amount, and few other assets. The claims filed against the bankrupt estate were almost entirely those contained on Miss Seay's list. Upon them the present suit by the trustee in bankruptcy was based, and the important question is whether they were covered by the terms of the bond.
Beginning in the fall of 1932, Miss Seay began the series of ten transactions described in her confession and in her testimony in this case. According to the record, she alone managed these transactions and she alone had knowledge of the unlawful conduct therein involved. Without going into the details, it is sufficient to say that these transactions fall into the following classes:
(1) A sale of a customer's securities for cash, with or without his authority; the deposit of the proceeds of sale into the company's bank account, and the failure on the part of the company to make remittance to the customer.
(2) The payment of money by a customer to the company with a direction to buy certain securities, the failure of the company to buy them or to return the money to the customer, and the deposit of the money in the company's bank account. In certain of these instances, when the securities subsequently advanced in price and the customer ordered a sale thereof, the customer was paid from the company's bank *812 account a sum of money representing the apparent profit, amounting to $190 in all.
(3) The deposit of securities by a customer to be exchanged for other securities; the making of the exchange by the company and the sale by the company of the securities received in exchange; the deposit of the proceeds of sale in the company's bank account without remittance to the customer. In one case the securities received in exchange were delivered to another customer to whom the company was indebted for like securities.
The aggregate of the sums of money involved in these transactions was $9,607.55, which was the precise sum for which the jury rendered its verdict as hereinafter set out; and the judgment of the court added interest thereto, calculated separately on each transaction, in the aggregate sum of $1,343.44. The testimony of Miss Seay in regard to these matters was not denied by any one, and in some instances was corroborated by customers with whom she dealt.
In all of these instances, the customers suffered a loss since the company went into bankruptcy with few assets. With these facts in mind, the District Judge reached the conclusion that the liability of the surety on the bond had been made out. He submitted to the jury the following issues: (1) in what amount, if any, are the defendants indebted to the plaintiff under the terms of the bond? and (2) did Schluter, Green & Co., through any of its officers or directors, have knowledge of, or give its consent to, the actions which resulted in this loss? He refused the request of the defendant to submit to the jury an issue as to whether the loss, if any, arose directly or indirectly from trading, actual or fictitious.
Upon the first issue, the judge instructed the jury that there was no question but that the amount of the loss was $9,607.55, with interest amounting to $1,343.44, and that, if the jury found that these accounts had been dishonestly handled by the witness Seay and that the losses occurred through her dishonest or criminal acts, the jury should find for the plaintiff on the first issue in the sum of $9,607.55. This instruction was tantamount to a directed verdict in favor of the plaintiff, since the undisputed evidence was that Miss Seay had been guilty of the misconduct described. Upon the second issue, the judge referred to the testimony of Green and of Miss Seay that Green knew nothing about the transactions and instructed the jury that if they believed this testimony to be true, to answer this issue in the negative. The jury so answered, and there was ample evidence to support this finding.
But we think there was error in the instruction of the court upon the first issue. The insured under the bond was the company and not the company's customers. If a bond for their protection had been intended, a very different proposition would have been presented to the surety, for it would have had to reckon not merely with the likelihood of a breach of trust by an employee, but with the chances that a broker in failing condition would misuse the money or securities of customers entrusted to him. We must therefore inquire in the first instance whether the company, in the language of the bond, suffered a loss through any dishonest or criminal conduct of its employee. The conduct of Miss Seay may fairly be described as dishonest or criminal; but it does not follow that thereby the company suffered a loss. On the contrary, it appears that the money derived from her unlawful behavior was deposited in the company's bank account, and, unless the company thereafter lost the funds as the result of dishonesty or criminal conduct, the company suffered no detriment.
Nor was there in the sense of the bond a loss by the company of the property held by it as collateral or as bailee, trustee, custodian, or in any other capacity, for while in some instances property entrusted to it was sold, the proceeds of the sale found their way into its coffers, so that it was provided with an equivalent with which at any time the property could have been replaced. It is true that the company suffered loss to the extent that its employee, in order to conceal her misdeeds, paid out fictitious profits in some transactions in class 2 above described, and a verdict for the company for the losses thus incurred would have been justified. But there was no basis for the broad view that any loss by a customer from the misconduct of the employee was recoverable under the bond, and the instruction of the court to this effect constituted reversible error.
It does not follow, however, in view of other evidence to which reference will presently be made, that the surety had no liability under the bond. Miss Seay also engaged in certain speculative dealings in the name of one Zimmerman wherein she bought or sold securities through Hubbard *813 & Co., a New York broker. These transactions were also divulged in her confession and in her testimony. Zimmerman was not produced as a witness, and it may be open to doubt whether the trading was actually her own or was his. It does not appear that the credit of the company was pledged or that it was involved in the business in any way. Some of the securities purchased declined in value and, when additional margins were called for, Miss Seay drew various sums, amounting in the aggregate to $4,520, from the company's bank account and used them to meet the demands. Manifestly the company suffered a loss in these matters as a result of the dishonest or criminal conduct of its employee and the surety would be liable unless the company was in fact involved in the business and the loss was excepted from the coverage of the bond by section 2 (j) as one suffered directly or indirectly from trading, in the manner hereinafter set forth.
A similar clause has been before the courts, so far as we are advised, in but three cases, namely, Harris v. National Surety Co., 258 Mass. 353, 155 N.E. 10; Rath v. Indemnity Insurance Company, 2 Cal.App. 2d 637, 38 P.2d 435; Earl v. Fidelity & Deposit Co., 138 Cal.App. 435, 32 P.2d 409. In each instance an employee of a brokerage house, making use of the credit of his employer, bought securities through a correspondent broker ostensibly for a customer but actually for himself, and in each case the account was closed out so that the employer suffered a loss. It was held that the excepting clause was applicable to such a situation, and was not confined to losses sustained by the broker in trading on his own account. In the present case the surety contends that the clause should be extended even further so as to cover losses in trading by an employee which the company has no liability to make good, provided only that the employee dishonestly uses his employer's money in the course of the business. We are of opinion that a loss suffered by the company in this fashion is not within the exception because it does not occur through trading directly or indirectly, actual or fictitious, but is occasioned by the dishonest use of the company's funds. There is ground for the ruling that the broker suffers a loss through trading, although the transaction is conducted without his knowledge and in the name of another, when the business is done in such a way that the broker is under a legal obligation to make the loss good. But it cannot be said with equal force that a loss is suffered directly or indirectly from trading for which the broker has no legal responsibility, merely because an employee who has engaged in an unsuccessful speculation unlawfully uses the broker's funds to make good the loss. At best, looking at the case from the standpoint of the surety, such an interpretation would be doubtful, and the doubt under the established rule must be resolved against it.
In addition to the losses occasioned by the withdrawal of moneys from the company's bank account to pay fictitious profits to customers and to pay the losses in the Zimmerman account, the appellee suggests other matters outside the ten transactions above mentioned to support the verdict of the jury. It is contended, notwithstanding the testimony of Miss Seay to the contrary, that the evidence showed that she kept for her own uses and did not deposit the sum of $2,243.78, representing part of the proceeds of sale of the Constable bonds which were involved in one of the transactions described in her confession. The proceeds of the sale of the bonds exceeded by the sum named the amount deposited in the company's bank account on or about the day of the sale of the bonds, as shown by the bank's ledger. Such an embezzlement would of course constitute a loss covered by the bond. It is also contended that an overdraft of Green in the amount of $1,100 and of Miss Seay in the amount of approximately $400 constituted recoverable losses. These overdrafts would also fall within the terms of the bond if they took place through dishonest or criminal acts of any of the employees. The evidence on these additional matters is confusing, and, as the case must be returned to the District Court for a new trial, and the evidence then submitted may not be the same, it is sufficient now to say that, if substantial evidence of the abstraction of a portion of the proceeds of the sale of the Constable bonds or of dishonesty or criminal conduct in connection with the overdrafts is then offered, it should be submitted to the consideration of the jury. As we have already indicated, the jury was asked to base its verdict upon the losses of customers in the ten transactions first above mentioned, and not upon the moneys expended in connection with fictitious profits, the Zimmerman account, or the overdrafts. *814 The latter transactions therefore cannot be used to sustain the present verdict, even if we should overlook the fact that the aggregate amount involved therein does not equal the amount of the jury's verdict.
The judgment must be reversed and the case remanded for a new trial.
Reversed and remanded.