**FIREMAN'S FUND INSURANCE COMPANY, Plaintiff,**

v.

**SPECIAL OLYMPICS INTERNATIONAL, INC., et al., Defendants.**

No. CIV.A. 01–10144–JGD.

United States District Court,
D. Massachusetts.

Jan. 24, 2003.

Gregory Faulkner, Halloran & Sage, Hartford, CT, Marisa L. Pizzi, Bowditch & Dewey, LLP, Framingham, MA, for Firemans Fund Insurance Company, Plaintiff.

David L. Evans, Hanify & King, Professional Corporation, Boston, MA, for Special Olympics International Inc, Special Olympics Massachusetts, Defendants.

### *MEMORANDUM OF DECISION AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT* [1]

DEIN, United States Magistrate Judge.

## I.  *INTRODUCTION*

This lawsuit stems from an unauthorized and fraudulent fund-raising scheme undertaken by an employee of the defendant,

---

**1.** The parties consented to transfer the case to this court for all purposes, including trial and the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73.

Special Olympics of Massachusetts, Inc. ("SOMA"), over a seven year period during which time the employee raised over $1,000,000.00 which he diverted to his personal use. Plaintiff Fireman's Fund Insurance Company ("Fireman's Fund"), SOMA's fidelity insurer, brought this diversity action against SOMA and its national affiliate, Special Olympics International, Inc. ("SOI") (SOMA and SOI are collectively referred to as the "Special Olympics"), seeking a declaratory judgment that it is not responsible for indemnifying the Special Olympics for the diverted funds under two crime insurance policies (the "Policies"). The Special Olympics counterclaimed, alleging Fireman's Fund (1) breached the Policies by not paying the amounts due, (2) breached its implied duty of good faith and fair dealing by refusing to indemnify the Special Olympics, and (3) violated Mass. Gen. Laws. ch. 93A, § 11 and ch. 176D.

Fireman's Fund has moved for summary judgment (Docket # 36) seeking a declaration that its denial of coverage was proper under the Policies. Fireman's Fund argues that it properly denied coverage because (1) SOMA did not suffer a direct loss under the meaning of the Policies, (2) SOMA's insurance claim was untimely, and (3) the perpetrator of the fraud was not a covered employee under the Policies. The Special Olympics has cross-moved for partial summary judgment on its claims of breach of contract and breach of implied covenant of good faith and fair dealing (Docket # 39).

For the reasons detailed herein, Fireman's Fund's "Motion for Summary Judgment" (Docket # 36) is ALLOWED and the Special Olympic's "Motion for Partial Summary Judgment" (Docket # 39) is DENIED.[2] A judgment shall enter declaring that Fireman's Fund is not liable to the defendants under the Policies for the claims raised in the Proof of Loss dated June 26, 2000.

## II. STATEMENT OF FACTS [3]

### Background

SOMA is a nonprofit corporation which acts under a franchise-like arrangement with SOI, a public charity, to empower "individuals with mental retardation to become physically fit, productive, and respected members of society through sports training and competition." (Johnson Aff. (Docket # 42) ¶¶ 2, 4). SOMA pays SOI an annual fee for the right to use the name and mark "Special Olympics" and acts under General Rules SOI promulgates. (*Id.*). SOI has similar arrangements with nonprofit groups in all 50 states and the District of Columbia and provides certain services to its state affiliates. (*Id.* ¶¶ 4–5). As SOI's Massachusetts affiliate, SOMA serves approximately 8,000 disabled persons throughout Massachusetts by providing twenty six sports events annually. (*Id.* ¶ 3).

SOMA's State Office is located in Danvers, Massachusetts. (*Id.* ¶ 7). Organizationally, below this Office the Commonwealth is divided into Sections, headed by a Section Directors. (*Id.*). Each Section is further divided into "Areas," each of which is run by an Area Manager who is "hired, supervised, directed, and controlled" by SOMA. (*Id.* ¶ 8). These employees are paid a monthly salary and receive W–2 tax forms from SOMA. (*Id.*). The Area Managers are responsible for "ensuring that

---

2. Because this court finds the "direct loss" issue dispositive, it does not address the other two grounds Fireman's Fund relies on in its Motion.

3. The following facts are undisputed unless otherwise noted.

high quality year-round sports training programs and athletic competition events are available to all eligible individuals within their areas." (*Id.*).

SOMA relies heavily on donations from various individuals and entities for its support. (*Id.* ¶ 9; Johnson Dep. at 16–18). Many of these contributions come from direct marketing, such as telemarketing and direct mail efforts. (Johnson Aff. ¶ 9). SOMA's efforts have resulted in an active telemarketing donor population of approximately 65,000 donors. (*Id.*). SOMA conducts these carefully controlled and closely monitored fund-raising campaigns both locally and nationally. (*Id.* ¶¶ 9–10; Johnson Dep. at 16–18). Occasionally, SOMA also engages in fund-raising within specific Areas. (Johnson Aff. ¶ 10). Under SOMA's policies, such Area activities may occur only "with the express authorization of the State Office." (*Id.*). However, even when an Area's fund-raising is approved, under no circumstances may Area Managers conduct direct telemarketing solicitations. (*Id.*). Rather, they are limited to special events conducted at the Area level or to participation in state-organized activities. (*Id.*).

At all times relevant to this litigation, SOMA maintained bank accounts with BayBank (which later became Fleet), which were controlled by the Section Directors (Scola Dep. at 23; Johnson Aff. ¶ 11). Under SOMA's regulations, "[n]o Area Manager is authorized to open or maintain an account in SOMA's name or on behalf of SOMA, and no Area Manager is authorized to sign checks." (Johnson Aff. ¶ 11; Scola Dep. at 41). Additionally, Area Managers are prohibited from having a separate account for their Area. (*Id.* at 23; Johnson Aff. ¶ 16).

In 1990, SOMA hired Gerald Tenglund ("Mr.Tenglund") as an Area Manager. (*Id.* ¶ 13). Shortly thereafter, the events ultimately leading to this lawsuit began.

### The Unauthorized Fund–Raising Activities

In 1991, Mr. Tenglund started an impermissive fund-raising campaign (the "Campaign") using SOMA's name but without SOMA's "authorization, knowledge, or approval." (Defs.' Statement of Undisputed Facts ¶ 15). Mr. Tenglund hired telemarketers to directly contact potential donors and solicit funds payable to SOMA. (*Id.*). This solicitation did not comport with SOMA's fund raising policies because, *inter alia,* it was done without authority and because under no circumstances were Area Managers permitted to conduct direct marketing activities. (Johnson Aff. ¶¶ 9–10, 15). According to SOMA, the Campaign was "not only an unauthorized telemarketing program but an illegal one" that "jeopardized the existence" of SOMA. (Johnson Meeting Notes at Bates # SOMA 000282).

On October 17, 1991, using SOMA's taxpayer identification number and a falsified SOMA corporate resolution, Mr. Tenglund opened an unauthorized checking account (the "Account") at Shawmut Bank (which is now Fleet Bank) in the name "MSO South Central."[4] (Johnson Aff. ¶ 15). Mr. Tenglund and his daughter signed the falsified corporate resolution as Area Manager and secretary, respectively. The Account, which SOMA did not know about, was not permitted under SOMA's own policies since Area Managers are not authorized to open such accounts and Area Man-

---

4.  SOMA was formerly known as Massachusetts Special Olympics or "MSO." (Johnson Aff. ¶ 15). Additionally, Mr. Tenglund was the Area Manager for the South Central Area at the time. (*Id.* ¶ 13).

agers are not permitted to have their own checking accounts. (Scola Dep. at 57, 23).

Between August 1992 and June 1999,[5] Mr. Tenglund deposited over $1,000,000 in the Account and withdrew all but $6,200. (Johnson Aff. ¶ 16; Defs.' Statement of Undisputed Facts ¶ 15). Except for a "stipend" which was paid to the telemarketers, Mr. Tenglund used these funds to pay various personal expenses. (Johnson Aff. ¶ 15; Johnson Meeting Notes at 1). SOMA did not know about either the Campaign or the Account.

### SOMA's Discovery of the Campaign

On or about April 12, 1999, a woman who had donated funds to the Campaign contacted SOMA's State Office to notify SOMA that her bank had returned a check to her because the check's recipient had improperly indorsed the check by writing the donor's name, instead of SOMA's name, on the back of the check. (Proof of Loss at 2). On or about May 17, 1999, a Framingham Police Department detective contacted Craig Comins, SOMA's Vice President for Marketing and Development, and notified Mr. Comins of this questionable check. (Id.). Mr. Comins referred the detective to Mr. Tenglund. (Id.). On or about May 24, 1999, the same detective contacted Mr. Comins again and informed him that the improperly indorsed check had been deposited in an account at Fleet (i.e., the Account). (Id.). Because Mr. Comins did not think SOMA had any accounts at Fleet, he checked with SOMA's

director of Administration and Finance, Gail Scola. (Id.; Scola Dep. at 53). Ms. Scola confirmed that at the time SOMA did not have any accounts at Fleet. (Id. at 54).

On May 26, 1999, Mr. Comins told SOMA's CEO, Robert Johnson, about the Account. (Johnson Aff. ¶ 16). SOMA gained control of the Account in late May 1999, at which time the Account's balance was only $6,200.00. (Id.).

On June 2, 1999, Mr. Johnson sent Mr. Tenglund a list of questions regarding the Account. (Id. ¶ 17). Mr. Tenglund replied to these questions via e-mail on or about July 5, 1999. (Tenglund Responses; Johnson Dep. at 85). In his responses, Mr. Tenglund admitted that no one at SOMA had authorized him to open the Account. (Tenglund Responses at Bates # SOMA 000272). Because Mr. Tenglund's answers were "evasive and contradictory," Mr. Johnson scheduled a meeting with Mr. Tenglund. (Johnson Aff. ¶ 17). During this meeting, which took place on July 13, 1999, Mr. Tenglund reiterated that no one at SOMA had authorized the Account. (Johnson Meeting Notes at Bates # SOMA 000278). Mr. Johnson terminated Mr. Tenglund at the end of the meeting. (Johnson Aff. ¶ 17).[6]

After Mr. Tenglund's termination, Mr. Johnson initiated a thorough investigation of both the Account and Mr. Tenglund's activities. (Id. ¶ 18). In connection with this investigation, Mr. Johnson hired Mullen & Company, LLP ("Mullen") as an

---

**5.** Because Fleet has a seven year record retention policy, bank records are not available for the Account before August 1992 and the Account's activity prior to this time is unknown. (Johnson Aff. ¶ 15; Mullen Report at Bates # SOMA 000015).

**6.** The parties disagree as to the reason SOMA terminated Mr. Tenglund. SOMA contends it discharged him "for insubordination, based

on Tenglund's maintenance of an unauthorized bank account" and that, at the time, no one at SOMA knew that Mr. Tenglund had diverted donations. (Johnson Aff. ¶ 17). Fireman's Fund contends that SOMA discharged Mr. Tenglund for stealing money. (Pl.'s Statement of Disputed Facts ¶ 18). This dispute does not need to be resolved at this time.

independent auditor. (*Id.*). Mullen reviewed bank records for the Account and determined the amount of money Mr. Tenglund had passed through the Account during the Campaign. (*Id.*). On October 20, 1999, Mr. Johnson attended a meeting with Mullen representatives who informed him of the full extent of Mr. Tenglund's Campaign. (*Id.*). Immediately after this meeting. Mr. Johnson informed the Middlesex County District Attorney's Office of Mr. Tenglund's conduct and the District Attorney subsequently initiated a criminal investigation. (*Id.*).

On November 3, 1999, Mullen provided Mr. Johnson with a summary of the Account's activity (the "Mullen Report"), detailing the Account's history since 1992. (*Id.;* Mullen Report). The Mullen Report does not indicate that any of SOMA's authorized bank accounts sustained a monetary loss during the time Mr. Tenglund conducted the Campaign.

### The Crime Insurance Policies

One of the services SOI provides for its state affiliates is procuring various types of insurance, including crime insurance (otherwise known as fidelity insurance) to protect against losses resulting from employee theft. (Johnson Aff. ¶¶ 5–6). SOI uses American Specialty Services, Inc. ("American Specialty") as its broker to obtain such insurance policies. (*Id.* ¶ 5). SOI obtained two crime insurance policies (the Policies) from Fireman's Fund on SOMA's behalf. (*Id.* ¶ 6). SOI is the primary insured on the Policies and SOMA is an additional insured. (Declarations at 2). One

Policy covered the period from January 1, 1997 to January 1, 1998 and the other covered SOMA from January 1, 1998 to January 1, 1999. (Policy E92XCR80352175; Policy E92XCR80361459). Except for the time periods, coverage is identical under both Policies, and each provides indemnification for covered losses up to $100,000. (*Id.*).

### Covered Loss

Through the Policies, Fireman's Fund promised to indemnify SOMA for "loss of, and loss from damage to, Covered Property resulting *directly* from the Covered Cause of Loss." (Employee Dishonesty Coverage Form—Coverage Form A at 1 ¶ (A) (emphasis added)). The Policies define "Covered Property" as "[m]oney, securities, and property other than money and securities." (*Id.* at 1 ¶ (A)(1)). "Property other than money and securities" is limited to "tangible property." (General Provisions at 5 ¶ (C)(3)).[7]

The "Covered Cause of Loss" is "Employee Dishonesty." That is defined as:

> dishonest acts committed by an employee, whether identified or not, acting alone or in collusion with other persons, except you or a partner, with the manifest intent to:
>
> (1) Cause you to sustain loss, and also
>
> (2) Obtain financial benefit (other than employee benefits earned in the normal course of employment, including: salaries, commissions, fees[,] bonuses, promotions, awards, profit sharing or pensions) for:

7. The Policies further provide that "[t]he property covered under this insurance is limited to property: (a) That you own or hold; or (b) For which you are legally liable. However, this insurance is for your benefit only. It provides no rights or benefits to any other person or organization." (General Provisions at 3 ¶ (B)(14)). The parties do not rely on this provision, although, as discussed in note 11, *infra,* it further supports the award of summary judgment in favor of Fireman's Fund.

(a) The employee; or

(b) Any person or organization intended by the employee to receive that benefit.

(Coverage Form A at 1–2 ¶¶ (A)(2), (D)(3)). The Policies exclude "Indirect Loss," which is defined as

Loss that is an indirect result of any act or occurrence covered by this insurance including, but not limited to, loss resulting from:

a. Your ability to realize income that you would have realized had there been no loss of, or loss from damage to, Covered Property.

b. Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this insurance.

c. Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this insurance.

(General Provisions at 1 ¶ (A)(3)).[8]

### The Claim Process [9]

After SOMA received the Mullen Report, it notified American Specialty that Mr Tenglund had diverted donations intended for SOMA. (Johnson Aff. ¶ 19). At that time, neither SOMA nor American Specialty knew which insurance company had issued any relevant policies. (*Id.* ¶¶ 6, 19). On May 5, 2000, American Specialty informed SOMA that American Specialty had located the Policies at SOI's Washington office. (*Id.* ¶ 21, American Specialty letter to SOMA dated May 5, 2000). Elev-

en days later, SOMA sent an "initial notice of potential claim" to Fireman's Fund, detailing Mr. Tenglund's impermissive activities. (Johnson letter to Kurator dated May 16, 2000). On June 5, 2000, Fireman's Fund sent a letter to SOMA's counsel both acknowledging receipt of the claim and providing SOMA with a Proof of Loss form to complete. (Evans Aff. (Docket # 43) ¶ 4, Ex. 6). SOMA submitted its Proof of Loss on June 26, 2000 and Firemen's Fund received the submission the next day. (Proof of Loss at 1; Pl.'s Statement of Undisputed Facts ¶ 16). In its Proof of Loss, SOMA listed its loss as $1,092,800, the amount it asserts Mr. Tenglund withdrew from the Account. (*Id.*; Johnson Dep. at 92–93).

On October 9, 2000, Fireman's Fund denied SOMA's claim on the grounds (1) SOMA did not suffer a direct loss covered under the Policies, (2) Mr. Tenglund was not a covered employee because he worked in a local program, and (3) the notice of loss was untimely. (Spock letter to Evans dated October 9, 2000).

### III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one which has the "potential to affect the outcome of the suit under applicable law."

---

8. Because the other provisions of the Policies on which Fireman's Fund relied when denying SOMA's claim are not material to the direct loss issue on which the court bases its decision, facts relating to those provisions are not included.

9. As this opinion does not address Fireman's Fund's claim that the notice was untimely, this summary of the facts relating to SOMA's filing of its claim is abbreviated and included for background purposes only.

*Sanchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir.1996) (internal citations and quotation omitted). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, ... would permit a rational fact finder to resolve the issue in favor of either party." *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990) (internal citations omitted).

To prevail on a motion for summary judgment, "the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir.1990). In order to defeat the entry of summary judgment, the nonmoving party must submit "sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial." *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 841 (1st Cir.1993), *cert. denied,* 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994) (internal citations and quotations omitted).

Cross-motions for summary judgment "do not alter the basic Rule 56 standard," rather such motions simply require the court to "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Group, Inc. v. Ferre Dev., Inc.,* 241 F.3d 103, 107 (1st Cir.2001). "When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56." *Dan Barclay, Inc. v. Stewart & Stevenson Serv., Inc.,* 761 F.Supp. 194, 197–98 (D.Mass.1991).

### B. *Interpretation of Insurance Policies*

■■■■ A fidelity bond is "a contract whereby one for consideration agrees to indemnify the insured against loss arising from the want of integrity, fidelity, or honesty of employees or other persons holding positions of trust." 11 *Couch on Insurance* 3d § 160:7; *accord Patrick v. St. Paul Fire & Marine Ins.,* No. Civ. 1:99CV314, 2001 WL 828251, at *3 (D.Vt. Feb.15, 2001) (unpublished decision), and cases cited. Fidelity bonds are construed according to the same rules as insurance contracts. *F.D.I.C. v. United Pac. Ins. Co.,* 20 F.3d 1070, 1079 (10th Cir.1994), and cases cited. *See also Citation Ins. Co. v. Gomez,* 426 Mass. 379, 381, 688 N.E.2d 951, 952 (1998) ("Interpretation of an insurance policy is no different from interpretation of any other contract.").[10] Consequently, interpreting an insurance policy presents a question of law for the court. *See Cody v. Conn. Life Ins. Co.,* 387 Mass. 142, 146, 439 N.E.2d 234, 237 (1982). If no ambiguity exists, the court must "construe the words of the policy in their usual and ordinary sense." *Citation Ins. Co. v. Gomez,* 426 Mass. at 381, 688 N.E.2d at 952 (internal citations and quotation omitted). However, any ambiguity is interpreted "in the way most favorable to the insured." *Id.,* 688 N.E.2d at 953.

Applying these principles to the instant case, this court concludes that the Special Olympics has not suffered a direct loss within the meaning of the Policies.

### C. *The Alleged Loss*

#### a. *Direct Loss*

■■■■ Fireman's Fund contends SOMA did not suffer an actual or "direct loss" under the Policies because no funds were taken from any of SOMA's authorized accounts and its assets were not diminished.

---

**10.** The parties agree that Massachusetts law governs this diversity action. *See Cipollone v.* *Yale Indus. Prods., Inc.,* 202 F.3d 376, 378 (1st Cir.2000), and cases cited.

The insured has the burden of proving it suffered a loss under the meaning of the policy. *See F.D.I.C. v. United Pac.*, 20 F.3d at 1080, and cases cited; *cf. Camp Dresser & McKee, Inc. v. Home Ins. Co.*, 30 Mass.App.Ct. 318, 321, 568 N.E.2d 631, 633 (1991) (stating "[a]s a general rule, the policyholder bears the initial burden of proving coverage within the policy description of covered risks"). In addition, Fireman's Fund asserts that any loss SOMA sustained was an "indirect loss" expressly excluded under the Policy. Fireman's Fund would have the burden of proving the application of such an exclusion. *See Camp Dresser & McKee, Inc. v. Home Ins. Co.*, 30 Mass.App.Ct. at 321, 568 N.E.2d at 633 (stating that once the insured shows the claim falls within the coverage language of the policy, the insurer bears the burden of proving the applicability of an exclusion). SOMA asserts its loss was "real and ascertainable to the penny" and Mr. Tenglund's actions are tantamount to his taking checks from SOMA's mailbox, from its authorized accounts, or from its petty cash supply. As detailed below, this court finds SOMA did not suffer a direct loss, and, therefore, that there was no coverage under the Policies.

■■ Under a fidelity crime bond, loss means "the deprivation or dispossession of money or property of the [insured] due to the dishonest, criminal or fraudulent acts" of the insured's employees. *Fitchburg Sav. Bank v. Mass. Bonding & Ins. Co.*, 274 Mass. 135, 149–50, 174 N.E. 324, 328 (1931). Under such policies, "direct loss" means "the actual depletion of bank funds caused by the employee's dishonest acts." *F.D.I.C. v. United Pac. Ins. Co.*, 20 F.3d at 1080, and cases cited. The "paradigmatic example" of such a direct loss is "an employee of the insured who embezzles money directly from the insured." *Finkel v. St. Paul Fire & Marine Ins. Co.*, No. 3:00CV1194 (AHN), 2002 WL 1359672, at *4 (D.Conn. June 6, 2002) (unpublished decision) ("a fidelity policy only indemnifies the insured for direct loss and does not provide coverage for the insured's liability to third parties"), and cases cited. Consequently, "[b]ookkeeping or theoretical losses, not accompanied by actual withdrawals of cash or other such pecuniary loss is not recoverable." *F.D.I.C. v. United Pac. Ins. Co.*, 20 F.3d at 1080, and cases cited. Rather, in order to trigger coverage, the assets of the insured must be diminished as a result of the dishonest act of the insured's employee. *See Cont'l Cas. Co. v. First Nat'l Bank of Temple*, 116 F.2d 885, 886–87 (5th Cir.), *cert. denied*, 313 U.S. 575, 61 S.Ct. 1087, 85 L.Ed. 1533 (1941).

Courts interpreting fidelity policies similar to those at issue in this litigation have consistently concluded that the insured does not suffer a direct loss unless the insured's assets, and not those of a third party, are reduced because of the offending employee's wrongful conduct. *See, e.g., id.* (concluding bank would only be entitled to coverage if bank's assets were actually depleted where bank's employees stole customers' deposits and concealed the scheme by replacing the stolen deposits with subsequent deposits of other customers); *In re Ben Kennedy & Assoc., Inc.*, 40 F.3d 318, 319–20 (10th Cir.1994) (limiting insured's recovery to actual amounts paid as result of employee's sham insurance scheme but denying coverage for loss of customer funds in its possession, but which it did not own); *Fid. & Deposit Co. of Md. v. USAFORM Hail Pool, Inc.*, 463 F.2d 4, 6–7 (5th Cir.1972) (finding no loss where offending employee used trust funds to pay insured's debts thereby converting its obligation to pay creditors to an obligation to pay customers whose funds had been diverted; assets of insured bank were neither increased nor diminished);

*In re Schluter, Green & Co.*, 93 F.2d 810, 812–13 (4th Cir.1938) (concluding customers, not insured brokerage firm, suffered loss when employee diverted customer funds and placed such funds in insured's account).

Thus, the critical issue in the instant case is whether the funds stolen by Mr. Tenglund resulted in a diminution of SOMA's assets. The undisputed facts establish they were not. As detailed below, the "donations," made without SOMA's knowledge and deposited into an account over which SOMA had no knowledge or control, were not consummated gifts. As the funds were unknown to SOMA, they were not included in SOMA's assets, and their use for Mr. Tenglund's personal expenses did not reduce SOMA's assets. The theft was of the putative donors' money and not SOMA's.

While not directly on point, the present situation is similar to that presented in *Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 962 F.Supp. 956 (N.D.Tex.1996), *aff'd*, 140 F.3d 622 (5th Cir.1998). There, an individual's assets were kept by the insured, Lynch Properties, but were maintained separately and not included in the assets of the company. 962 F.Supp. at 963. For various reasons, the District Court concluded that the theft of the individual's funds by an employee of the company was not covered by a fidelity bond issued to the company. One reason the District Court denied coverage was be-

cause there was no "direct loss" to the company as its assets had not been reduced. *See id.* at 962–63.[11] Similarly, in SOMA's case, the diverted funds were not part of SOMA's assets, even though they may have seemingly been in SOMA's possession (i.e., in an account in SOMA's name).

Moreover, in the instant case, as in *Lynch*, the "indirect loss exclusion" in the Policies "reinforces the conclusion that the policy meant to insure [SOMA] only against immediate harm from employee dishonesty but not for any obligations [SOMA] might have to others as a result of that dishonesty." 962 F.Supp. at 964 (insurer not liable for stolen funds insured reimbursed to victim of theft).[12] SOMA would indeed suffer a loss if it reimbursed the putative donors after they complained that they were defrauded of their contributions. However, the loss would remain that of the donors, and not of SOMA. As such, this reimbursement would not be a covered loss since it would be an indirect loss.

■ Finally, the record does not support SOMA's contention that had Mr. Tenglund not diverted the funds then SOMA would have received these funds. SOMA did not initiate, authorize, or know about the Campaign, nor was such a fund-raising effort permitted under SOMA's own rules. The undisputed facts establish that had SOMA learned of the Campaign during its

---

**11.** On appeal, the Fifth Circuit did not address this ground, but affirmed the District Court's grant of summary judgment to the defendant insurer on the grounds that the funds were not "held" by the insured, nor were they funds for which the insured was "legally liable" as required by the policy. 140 F.3d at 628–30. Neither of the parties mentioned these provisions. However, as the Policies at issue in this case contain the same provisions as in *Lynch, see* note 7, *supra*, the reasoning of the Fifth Circuit is also applicable to the instant case and further supports the allowance of Fireman's Fund's motion for summary judgment.

**12.** Since there is no covered loss under the Policies, the issue of whether the "indirect loss" exclusion applies does not need to be reached. However, the existence and language of the exclusion is further evidence of the meaning of the Policies' "direct loss" requirement. *Lynch*, 962 F.Supp. at 964.

pendency, it would have terminated the Campaign, not stepped into Mr. Tenglund's shoes and continued soliciting funds. Moreover, this argument does not change the fact that when the donations were made they were deposited into an account that was unknown to SOMA, unauthorized by SOMA, and over which SOMA had no control. The fact that some of the solicited money went to SOMA after Mr. Tenglund's wrongdoing had been discovered does not alter the fact that the money was not an asset of SOMA's during the unlawful Campaign.

Here, the donors, not SOMA, suffered a direct loss. However, loss to such third parties is not a direct loss triggering coverage. *See In re Schluter, Green & Co.,* 93 F.2d at 812. The only other loss SOMA potentially suffered was reputational damage based on the possible reluctance of future donors to make contributions to SOMA if such potential donors learn of the Campaign. However, this loss is an intangible asset which is not covered under the Policies. Fireman's Fund is not obligated to indemnify SOMA for the funds Mr. Tenglund's diverted.

### b. *The Doctrine of Gifts*

█ In order to establish that Mr. Tenglund stole funds belonging to the Special Olympics, the defendants assert that the funds Mr. Tenglund solicited were gifts. Fireman's Fund argues that the donations failed as gifts because no valid delivery ever took place. This court agrees with Fireman's Fund's contention.

█ It is well settled that in order to have a completed gift, there must be "evidence of donative intent on the donor's part, combined with evidence of delivery of the property to the donee, or someone acting on the donee's behalf, in a manner that surrenders dominion and control." *Edinburg v. Edinburg,* 22 Mass.App.Ct.

199, 204, 492 N.E.2d 1164, 1167, *review denied,* 398 Mass. 1101, 495 N.E.2d 310 (1986); *accord Kobrosky v. Crystal,* 332 Mass. 452, 460, 125 N.E.2d 385, 390–91 (1955) (finding lack of delivery where donee knew of intended gift but did not have access to the gifted funds held in a safe or know that the safe existed).

█ The parties in the instant case do not dispute that the individuals who sent money to Mr. Tenglund during the Campaign possessed the requisite donative intent. However, the parties heavily contest whether the funds were delivered to SOMA. While it is true that delivery may be effectuated by giving the putative gifted property to a third party who is acting on the donee's behalf, that is not the case here. *See, e.g., Hardy v. Finger,* 347 Mass. 779, 779, 199 N.E.2d 533, 533 (1964) (holding employer did not effectuate delivery of funds kept in bank account to housekeeper by giving bankbook to employer's conservator despite noting on bankbooks that the funds belonged to the housekeeper, where housekeeper lacked access to the funds); *Monaghan v. Monaghan,* 320 Mass. 367, 369–70, 69 N.E.2d 476, 477 (1946) (finding lack of delivery where donor gave gifted property to potential donee's son to deliver to donee).

The donors' gifts to SOMA failed because Mr. Tenglund was not acting on SOMA's behalf. Neither the telemarketers nor Mr. Tenglund were authorized by SOMA to solicit or collect these funds. Additionally, although Mr. Tenglund used SOMA's name when soliciting the funds, SOMA did not have any ability to supervise, direct, or control Mr. Tenglund while he was conducting the Campaign and had no control over the Campaign itself. SOMA did not even know about the Campaign during its pendency.

 Additionally, SOMA did not know about the Account, or have access to it and/or control of it, at the time Mr. Tenglund received the donations and placed them into the Account. Moreover, Mr. Tenglund was not authorized to maintain such an Account. Thus, although the Account was in SOMA's name and was opened with SOMA's tax identification number, the funds were not delivered to SOMA. The gifts were not completed, and the funds improperly solicited by Mr. Tenglund were not part of SOMA's assets. As a result, Mr. Tenglund's diversion of the funds did not result in a direct loss to SOMA.

## IV. *CONCLUSION*

For the reasons detailed herein, Fireman's Fund's "Motion for Summary Judgment" (Docket #36) is ALLOWED and the Special Olympic's "Motion for Partial Summary Judgment" (Docket #39) is DENIED. A judgment shall enter declaring that Fireman's Fund is not liable to the defendants under the Policies for the claims raised in the Proof of Loss dated June 26, 2000.

---

