**ELMER FOX & COMPANY, a partnership, Plaintiff,**

v.

**COMMERCIAL UNION INSURANCE COMPANY OF NEW YORK, Defendant.**

**Civ. A. No. 66–C–303.**

United States District Court D. Colorado.

Aug. 29, 1967.

Holme, Roberts & Owen, Peter H. Holme, Jr., Martin B. Dickinson, Jr., and Donald K. Bain, Denver, Colo., for plaintiff.

Yegge, Hall, Treece & Evans, Richard D. Hall, and Roland E. Gebert, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

CHILSON, District Judge.

This is an action to recover the sum of $10,000.00 under Insuring Agreement I and $10,000.00 under Insuring Agreement V of a "Dishonesty, Disappearance and Destruction Policy" issued by Mercantile Insurance Company of America and assumed by the defendant. The action arises out of certain acts of Phillip E. Corey, who was an employee of the plaintiff.

The Court has heard the evidence and argument of counsel and has considered the written briefs submitted by the parties and is now duly advised.

The statement of facts set forth in plaintiff's opening brief is, with some minor exceptions, accepted by the defendant as "the statement of evidence in the case."

The Findings of Fact in this case are those set forth in plaintiff's opening brief with such modifications thereof as the Court deems appropriate to meet the objections of the defendant. These Findings of Fact are as follows:

## FINDINGS OF FACT

At all times pertinent hereto Annsons, Inc., Bark, Inc., Concord Jewelry, Inc., Denmor, Inc., Edsons, Inc., Family, Inc. and Harmony, Inc. ("the jewelry companies") had a contract with plaintiff Elmer Fox & Company ("Elmer Fox"), an accounting partnership, to do their

bookkeeping, to prepare financial reports, to handle the transfer of funds among bank checking accounts maintained by them and to do other related work. Except for Concord Jewelry, Inc. and Denmor, Inc., whose places of business were located in the Denver metropolitan area, each of the jewelry companies operated a retail jewelry business in a Gem discount store in another state and maintained a local checking account there. In addition, each of the jewelry companies maintained a general checking account in Denver. Except for Family, Inc., whose general checking account was with Guaranty Bank & Trust Co. for part of the time in question, all of the general accounts were with Denver United States National Bank. Local employees of the jewelry companies deposited daily receipts in the local accounts and the funds accumulated in the local accounts were frequently transferred to the general accounts by means of checks drawn on the local accounts and deposited in the general accounts. Payroll expenses, rent, purchase of merchandise and other operating expenses generally were paid by checks drawn against the general accounts. Morris Krulak & Co., a separate corporation, handled the purchase of merchandise from suppliers and acted as a wholesaler for the jewelry companies. Each of the jewelry companies purchased its merchandise from Morris Krulak & Co. All of the jewelry companies and Morris Krulak & Co. were owned by two brothers, Ralph and Bert Kleiger, except for a few shares owned by Max Zall.

Elmer Fox assigned an employee, Phillip E. Corey, who became a certified public accountant in June 1965, to handle the jewelry companies accounts. Corey did the bookkeeping work, prepared the necessary financial reports and either he or an employee working under his direction received the bank statements and cancelled checks of the jewelry companies. Corey worked under the general supervision of the Elmer Fox partners and in connection with the jewelry companies, he reported to Lynn Lawrence.

Among Corey's duties was that of deciding when to transfer funds between the various accounts and preparing checks on the general accounts for payment of company obligations. He was not authorized to sign checks on the accounts, but prepared such checks for signature by certain designated partners of Elmer Fox or, on occasion, for signature by certain officers of the jewelry companies. The authorized signatures for withdrawals from the bank accounts were the President and Secretary of the respective companies and Bryden, Wegscheider and Lawrence, who were partners in Elmer Fox & Company and were designated in the bank resolutions as "Auditors." In order to facilitate performance of these duties Elmer Fox possessed rubber stamps reading "For deposit only" and "Edsons, Inc.–1701 Security Life Building-Denver, Colo. 80202" and similar rubber stamps for each of the other six jewelry companies. He used these stamps for the purpose of endorsing checks for deposit in the general checking accounts, including checks drawn on the respective local accounts of the jewelry companies.

On or about January 21, 1964, Corey, wholly without authority, opened a checking account in the name of Edsons, Inc. at The Central Bank and Trust Co. ("Central Bank"). In connection with this Corey executed a spurious certificate of banking resolution upon a form provided by Central Bank which represented that Corey was president of Edsons, Inc. and Ralph Kleiger secretary of Edsons, Inc. Corey signed his own name to this certificate and forged Kleiger's signature. Additionally Corey executed a signature card provided by Central Bank showing his own signature as president and the forged signature of Kleiger as secretary.

In fact, Corey was not and never had been an officer in Edsons, Inc. Kleiger in fact was secretary thereof. Corey took all of the foregoing action without the knowledge of any officer or employee of Edsons, Inc. or of any of the other jewelry companies or of any partner or other

employee of Elmer Fox. No corporate resolutions were ever adopted by Edsons, Inc. authorizing signatures as aforesaid or the opening of the account.

Subsequently, and in ostensible compliance with established practice, Corey from time to time prepared checks payable to Edsons, Inc. and drawn upon existing bank accounts of the various jewelry companies. Corey affixed rubber stamps reading "For deposit only" and "Edsons, Inc.–1701 Security Life Building-Denver, Colo. 80202" to the checks and then obtained the signatures of authorized partners of Elmer Fox on the checks without disclosing to them his intent not to deposit them in accordance with established practice in the general account maintained at Denver United States National Bank in the name of Edsons, Inc.

Thereupon, Corey presented said checks to Central Bank for deposit in the spurious 'bank account which he had opened there in the name of Edsons, Inc. Central Bank collected the amount of each from the drawee bank and the drawee bank of each such check charged the account against which the check was purportedly drawn with the amount paid by it to Central Bank. The total amount of such charges against the jewelry companies' bank accounts was $121,500.

On or about May 20, 1965, Corey, wholly without authority, opened a checking account in the name of Bark, Inc. at Colorado National Bank of Denver ("Colorado National"). In connection with this Corey executed a spurious certificate of banking resolution upon a form provided by Colorado National which represented that George Reynolds was president of Bark, Inc. and Ralph Baker secretary of Bark, Inc. In fact, both George Reynolds and Ralph Baker are fictitious persons having no relationship to Bark, Inc. Corey signed both of these names to the certificate and in addition executed a signature card provided by Colorado National showing the signature of George Reynolds as president and the signature of Ralph Baker as secretary.

As with the spurious account at Central Bank, Corey took all of the foregoing action without the knowledge of any officer or employee of Bark, Inc. or of any of the jewelry companies affiliated with it or of any partner or other employee of Elmer Fox. No corporate resolution was ever adopted by Bark, Inc. authorizing signatures as aforesaid or the opening of the account.

Subsequently, and in ostensible compliance with established practice, Corey prepared three checks payable to Bark, Inc. and drawn upon Bark, Inc.'s local account. As with the checks deposited in Central Bank, Corey affixed the appropriate rubber stamps, obtained the signatures of authorized partners of Elmer Fox on the checks and presented the checks to Colorado National for deposit in the spurious account. Colorado National collected the amount of each such check, credited the funds to the spurious account and the drawee bank charged the account against which the checks were purportedly drawn with the amount paid by it to Colorado National. The total amount of such charges was $9,500.

With the exception of approximately $364 the $131,000 deposited in the spurious checking accounts in Central Bank and Colorado National was withdrawn by Corey for his own personal use and benefit.

According to Lynn Lawrence's testimony, Elmer Fox first discovered Corey's acts in November, 1965.

Elmer Fox immediately advanced $131,000 to the jewelry companies and took a promissory note in that amount from Morris Krulak & Co.

Insuring Agreement I provides in its essential parts to pay the plaintiff for:

"A loss of Money, Securities and other property which the Insured shall sustain to an amount not exceeding in the aggregate the amount stated in the Table of Limits of Liability applicable to this Insuring Agreement I, through any fraudulent or dishonest act or acts committed by any of the

Employees, acting alone or in collusion with others."

Under section 5 of the Conditions and Limitations to the policy:

"The insured property may be owned by the Insured, or held by the Insured in any capacity whether or not the Insured is liable for the loss thereof, or may be property as respects which the Insured is legally liable; * * *"

Insuring Agreement V provides for payment to Elmer Fox for:

"Loss which the Insured or any bank which is included in the Insured's proof of loss and in which the Insured carries a checking or savings account, as their respective interests may appear, shall sustain through forgery or alteration thereof, on or in any check, draft, promissory note, bill of exchange, or similar written promise, order or direction to pay a sum certain in money, made or drawn by or drawn upon the Insured, or made or drawn by one acting as agent of the Insured, or purporting to have been made or drawn as hereinbefore set forth, * * *"

The liability, if any, under Insuring Agreement I is $10,000.00 and the liability, if any, under Insuring Agreement V is $10,000.00.

### INSURING AGREEMENT I

The Pre-Trial Order states the contested issues under Insuring Agreement I as:

"(a) Whether the lost money, securities or other property was held by plaintiff in any capacity, or in the alternative,

"(b) Whether the lost money, securities or other property was property as respects which plaintiff is legally liable.

"(c) Whether plaintiff has sustained such loss."

From the evidence, the Court concludes as a matter of law:

■ 1. That the money dishonestly obtained by Corey from the bank accounts involved was money which was held by Elmer Fox & Company within the meaning of Insuring Agreement I.

2. That plaintiff has sustained a loss with regard thereto in excess of the sum of $10,000.00

3. That the plaintiff is entitled to recover from the defendant under Insuring Agreement I the sum of $10,-000.00 together with interest thereon at six per cent per annum from the date of the commencement of this action and its costs to be taxed by the Clerk of this Court upon filing a bill of costs.

### INSURING AGREEMENT V.

The Pre-Trial Order states the contested issues under Insuring Agreement V as:

"(a) Whether the unauthorized transactions of Corey constituted forgery within the meaning of Insuring Agreement V.

"(b) If so, whether such transactions caused a loss covered within the meaning of Insuring Agreement V.

"(c) Whether plaintiff has sustained such loss."

The plaintiff contends:

"The unauthorized use of a rubber stamp signature is forgery, assuming the requisite intent to defraud is present. 1 Paton's Digest, "Checks", § 2.9. In fact, Insuring Agreement V expressly states that 'mechanically reproduced facsimile signatures are treated the same as handwritten signatures.' "

■■ The fallacy of plaintiff's argument is that the use of the rubber stamp endorsement was neither "unauthorized" nor a "signature". The plaintiff's statement of facts discloses that Corey was authorized to use the rubber stamp endorsement. The rubber stamp endorsement consists of the words "For deposit only" with the name and address of the company. This is not a signature. (See Black's Law Dictionary, Fourth Edition, and Websters Third New International Dictionary.) The statement that the endorsements are "mechanically reproduc-

**240**

ed facsimile signatures * * *" is unsound for the same reason.

 The Court concludes as a matter of law that the unauthorized transactions of Corey did not constitute forgery within the meaning of Insuring Agreement V and that the defendant is entitled to judgment in its favor and against the defendant with respect to the plaintiff's claim under Insuring Agreement V.

It is therefore ordered that judgment be entered in favor of the plaintiff and against the defendant in the amount of $10,000.00 together with interest thereon at the rate of six per cent per annum from June 8, 1966 to this date and for the plaintiff's costs to be taxed upon filing a bill of costs.