**LYNCH PROPERTIES, INC., Plaintiff,**

v.

**POTOMAC INSURANCE COMPANY OF ILLINOIS, Defendant.**

**Civil Action No. 3:96–CV–0230–G.**

United States District Court,
N.D. Texas,
Dallas Division.

Nov. 7, 1996.

---

Charles L. Perry, Arter Hadden Johnson & Bromberg, Dallas, for plaintiff.

Russell Joseph Bowman, Cozen & O'Connor, Dallas, for defendant.

## MEMORANDUM ORDER

FISH, District Judge.

Before the court is the motion of the defendant Potomac Insurance Company of Illinois ("Potomac") for summary judgment. For the reasons stated below, the motion is granted.

## I. BACKGROUND

This case involves a dispute over the extent of coverage under an employee fidelity policy issued by Potomac to plaintiff Lynch Properties, Inc. ("Lynch"). From February 22, 1994 through February 22, 1995, Potomac provided commercial property, liability, and crime coverage to Lynch under the terms of its insurance policy number TPP 1091956–02 ("the policy"). Defendant's Motion for Summary Judgment ("Motion"), Exhibit D at 1. The crime coverage portion of the policy provided Lynch with blanket employee dishonesty insurance. *Id.* at 1, 48–54. Lynch was the only named insured on the policy. *Id.* at 1, 48.

Lynch was in the business of owning and managing commercial real estate and investing in private companies. Sherri Pogue Deposition ("Pogue Depo.") at 7. However, Lynch also performed various accounting

duties for the private funds of Martha H. Lynch ("Ms.Lynch"), the eighty-seven year-old mother of Lynch's president, Harry H. Lynch. *Id.* at 15, 29. These duties involved writing checks, reconciling bank statements, and preparing financial statements. *Id.* at 18. Ms. Lynch's funds were initially held in accounts at Cullen Frost Bank but were later moved to Comerica Bank. *Id.* at 16. Though Ms. Lynch invested in one of Lynch's entities, the personal funds for which Lynch provided accounting services did not derive from any Lynch property or investment. *Id.* at 28–29. No formal written agreement governed Lynch's handling of Ms. Lynch's funds, but Ms. Lynch did pay a fee for the accounting duties performed. *Id.* at 16, 21. This fee was part of a larger, $50,000 fee that Ms. Lynch paid yearly for Lynch to manage the investment she had in one of its entities. *Id.* at 45–46.

From mid–1991 through March, 1994, Eva Bartlett ("Bartlett"), one of the bookkeepers at Lynch, managed the multiple checking accounts containing Ms. Lynch's personal funds. *Id.* at 18–20. Aside from bookkeeping duties, Bartlett also handled requests from Ms. Lynch for the payment of bills or for spending money. *Id.* at 18, 21, 31. The checks for spending money required Bartlett to go to the bank, cash a check authorized by Ms. Lynch, Harry H. Lynch, or Ms. Lynch's other son Bill Lynch, and deliver the cash to a courier service for delivery to Ms. Lynch or her personal secretary. *Id.* at 21, 35–36.

Around the third week of September, 1994, one of the bookkeepers at Lynch discovered a discrepancy between a cancelled check and the entry for that check recorded in the general ledger of Ms. Lynch's personal accounts. *Id.* at 12. The bookkeeper then began to match each check booked into the ledger with the actual check written, id. at 14, and the investigation ultimately revealed that Bartlett had embezzled approximately $19,000 from Ms. Lynch's personal accounts. *Id.* at 12, 36–42; Motion at 2. No funds had been embezzled from any of the Lynch accounts managed by Bartlett, Pogue Depo. at 25–26, and Lynch transferred its own funds to replace those embezzled by Bartlett from

Ms. Lynch's accounts. Sherri Pogue Affidavit at 1.

Based on the $19,000 loss, Lynch filed a claim with Potomac under the policy. All of the parties investigating the claim were uncertain as to whether the policy covered Lynch, and they sought legal advice in an effort to give Lynch the benefit of any doubt. Darrell Wayne Davis Deposition ("Davis Depo.") at 94–95. Potomac later denied the claim on the basis of several provisions and exclusions in the policy. Motion, Exhibit E, Letter Denying Coverage.

Lynch filed suit on March 22, 1995 to collect for its claimed loss under the policy. Plaintiff's Original Petition at 2. Lynch also included causes of action for breach of good faith and for relief under the Texas Deceptive Trade Practices Act and Insurance Code stemming from Potomac's denial of its claim. *Id.* at 3; Plaintiff's First Amended Original Petition at 3. After removing the case to this court, Potomac moved for summary judgment, arguing that the policy's terms unambiguously showed that it did not cover Lynch for liabilities resulting from Bartlett's conduct and that the genuine dispute over coverage precluded Lynch's recovery on its other causes of action. For the reasons stated below, Potomac's motion is granted.

## II. ANALYSIS

At the outset, the court notes that this is a diversity case, and as a result, the court must apply Texas law. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78–79, 58 S.Ct. 817, 822–23, 82 L.Ed. 1188 (1938). Since—as Potomac points out—the precise policy terms at issue in this case have not been interpreted by any Texas court, Brief in Support of Defendant's Motion for Summary Judgment ("Brief") at 5, this court will look to general principles of Texas law regarding the interpretation of insurance contracts. In addition, after considering the opinions of other courts which have construed the disputed terms, this court must predict how the Texas Supreme Court would interpret these terms. *Benante v. Allstate Insurance Company,* 477 F.2d 553, 554 (5th Cir.1973) (where no state court has decided point in issue, federal court should

male "educated guess" as to how that state's supreme court would rule).

### A. Evidentiary Burdens on Motion for Summary Judgment

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).[1] "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The movant makes such a showing by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues. See *Celotex Corporation v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Once the movant makes this showing, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Id.* at 323–24, 106 S.Ct. at 2552–53. To carry this burden, the opponent must do more than simply show some metaphysical doubt as to the material facts. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Instead, it must show that the evidence is sufficient to support a resolution of the factual issue in its favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11. All of the evidence must be viewed, however, in a light most favorable to the motion's opponent. *Id.* at 255, 106 S.Ct. at 2513 (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)). Summary judgment is properly entered against a party if after adequate time for discovery, it fails to establish the existence of an element essential to its case and as to which it will bear the burden of proof at trial. *Celotex, supra*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

### B. Insurance Policy Interpretation Under Texas Law

*In National Union Fire Insurance Company of Pittsburgh, Pennsylvania v. CBI Industries, Inc.*, 907 S.W.2d 517 (Tex.1995), the Texas Supreme Court summarized the approach courts must take when interpreting insurance contracts. "Insurance policies are controlled by rules of interpretation and construction which are applicable to contracts generally." *Id.* at 520; see also *Nutmeg Insurance Company v. Pro–Line Corporation*, 836 F.Supp. 385, 388 (N.D.Tex.1993) (citing *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex.1991)). "The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument." *CBI Industries*, 907 S.W.2d at 520. In determining the intent of the parties, the court construes the policy to give effect to each of its terms and to avoid rendering any term meaningless. *Ideal Mutual Insurance Co. v. Last Days Evangelical Association, Inc.*, 783 F.2d 1234, 1238 (5th Cir.1986).

■ In construing a contract, the court must determine whether its meaning is ambiguous. "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole...." *CBI Industries*, 907 S.W.2d at 520; see also *Brooks, Tarlton, Gilbert, Douglas, & Kressler v. United States Fire Insurance Company*, 832 F.2d 1358, 1364 (5th Cir.1987). A written contract is ambiguous if its language "is subject to two or more reasonable interpretations" but is not ambiguous if it is "so worded that it can be given a definite or certain legal meaning." *CBI Industries*, 907 S.W.2d at 520. Mere disagreement between the parties about the correct interpretation of the term will not render the term ambiguous, nor will it transform the issue of law into an issue of fact. *D.E. W., Inc. v. Local 93,*

---

1. The disposition of a case through summary judgment "reinforces the purpose of the Rules, to achieve the just, speedy, and inexpensive determination of actions, and, when appropriate, affords a merciful end to litigation that would otherwise be lengthy and expensive." *Fontenot v. Upjohn Company*, 780 F.2d 1190, 1197 (5th Cir.1986). In addition, disposition by summary judgment is appropriate where a contract at issue in the case is unambiguous and the parties' intent presents no genuine issue of material fact. *First National Bank of Jackson v. Pursue Energy Corporation*, 799 F.2d 149, 151 (5th Cir.1986).

*Laborers' International Union of North America*, 957 F.2d 196, 199 (5th Cir.1992).

■ Where a policy term is ambiguous, the court will construe that term in favor of the insured. *Toops v. Gulf Coast Marine Inc.*, 72 F.3d 483, 486 (5th Cir.1996) (quoting *Adams v. John Hancock Mutual Life Ins. Co.*, 797 F.Supp. 563, 567 (W.D.Tex.1992) [aff'd, 49 F.3d 728 (5th.Cir.1995) (table)]). In addition, when construing a policy term that excludes or limits coverage, the court must adopt any reasonable interpretation of the exclusion urged by the insured, even if the interpretation of the insurer appears more reasonable or a more accurate reflection of the parties' intent. *Id.*

■ These rules of construction, however, apply only when the terms of the policy are ambiguous. *Ranger Insurance Company v. Bowie*, 574 S.W.2d 540, 542 (Tex.1978). The court will not alter the clear terms of an insurance policy or strain to find an ambiguity where none exists. *Calcasieu–Marine National Bank of Lake Charles v. American Employers' Insurance Co.*, 533 F.2d 290, 296 (5th Cir.), *cert. denied*, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976) (Louisiana law); *Vest v. Gulf Insurance Company*, 809 S.W.2d 531, 533 (Tex.App.—Dallas 1991, writ denied). See *State Farm Life Insurance Company v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995) (only if an insurance policy remains ambiguous despite ordinary canons of contract construction should courts construe its language against the insurer in a manner that favors coverage). In addition, the coverage of a fidelity insurance policy "cannot be extended by implication, or enlarged by construction, beyond the actual terms of the agreement entered into by the parties." *Texas Pacific Indemnity Company v. Atlantic Richfield Company*, 846 S.W.2d 580, 583 (Tex.App.—Houston [14th Dist.] 1993, writ denied) (citation omitted); see *also Federal Deposit Insurance Corporation v. Aetna Ca-*

*sualty and Surety Company*, 426 F.2d 729, 736 (5th Cir.1970).

## C. The Policy's Terms

Potomac advances several grounds, all based on the policy's language, for its denial of Lynch's claim. While each has merit, together they demonstrate that the policy's language is not ambiguous and that no genuine issues of material fact exist as to the policy's scope. Potomac is therefore entitled to judgment as a matter of law.

### 1. Loss Must Result "Directly From" Employee Dishonesty

■ Under the heading "COVERAGE," the policy provides that "[w]e will pay for loss of, and loss from damage to, Covered Property resulting directly from the Covered Cause of Loss." "Covered Cause of Loss" is defined shortly thereafter as "employee dishonesty," and "Covered Property" is defined as "'money,' 'securities,' and 'property other than money and securities.'"[2] Motion, Exhibit D at 49.

Based on this provision, Potomac argues that the policy does not cover Lynch for the type of loss it suffered. The "directly from" language, Potomac contends, allows coverage only for losses that are the immediate (*i.e.*, not indirect) effect of employee dishonesty. Since the direct result of Bartlett's embezzlement was a loss to Ms. Lynch's personal funds, and the indirect result was Lynch's replacement of those lost funds, Potomac concludes that Lynch cannot recover under the policy.

The court finds this argument persuasive. Inclusion of the words "resulting directly from" indicates an intent to limit the coverage available and is especially significant because the language appears in a section of the policy that specifically addresses the scope of coverage. In addition, courts construing analogous language have reached similar conclusions. See *Federal Deposit Insurance Corporation v. United Pacific In-*

---

**2.** The parties dispute whether the funds embezzled by Bartlett fall within the definition of "Covered Property." Though Potomac concedes that checks are a type of "security," Brief at 5, it argues that since the checks did not draw on funds belonging to Lynch, they cannot be Cov-

ered Property. However, on its face the definition of Covered Property does not attempt to draw distinctions between whose loss the policy will cover but rather what type of lost property will be covered.

*surance Company*, 20 F.3d 1070, 1080 (10th Cir.1994) ("Language in a fidelity bond to the effect that the insured is covered for 'losses directly resulting from . . . .' indicates a direct loss or the actual depletion of [the insured's] funds caused by the employee's dishonest acts."); *Continental Bank, NA. v. Aetna Casualty & Surety Company*, 164 Misc.2d 885, 626 N.Y.S.2d 385, 387–88 (N.Y.Sup.Ct.1995) (in policy containing "directly from" language, no coverage available for insured whose employees caused customers, but not insured, to suffer "actual loss"). In light of these decisions, the court finds no ambiguity in the policy's "resulting directly from" language. Rather, the intent is dear to provide coverage only for direct losses to the insured, i.e., Lynch, from acts of employee dishonesty.

### 2. *Employee Dishonesty Requires Intent To Cause Loss To Insured*

■ The policy defines "employee dishonesty" as

dishonest acts committed by an "employee," whether identified or not, acting alone or in collusion with other persons, except you or a partner, with the manifest intent to:

(1) Cause you to sustain loss; and also

(2) Obtain financial benefit other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment for:

(a) The "employee". . . .

Motion, Exhibit D at 49 ¶ 2. As used in subparagraph (1), "you" is defined as the named insured, Lynch. *Id.* at 51.

■ Potomac argues that while Bartlett had a clear intent to enrich herself through her embezzlement activity, she did not have the manifest intent to cause Lynch any loss, and thus her acts do not amount to employee dishonesty as defined in the policy. "Manifest intent" has been defined in the fidelity insurance context as intent that is "apparent or obvious." *United Pacific Insurance Company*, 20 F.3d at 1078 (citing cases). "Manifest intent does not require that the employee actively wish for or desire a particular result; rather, manifest intent

exists when a particular result is substantially certain to follow from the employee's conduct." *Id.* To determine an employee's intent, her "subjective motive and purpose," as well as inferences from "tangible manifestations of behavior," should be considered. *First National Bank of Louisville v. Lustig*, 961 F.2d 1162, 1166 (5th Cir.1992).

■ Under this standard, there is no genuine issue of fact as to Bartlett's intent. Lynch has come forward with no evidence to demonstrate Bartlett's subjective motive or purpose, though it seems dear that she sought personal gain. Her gain, however, did not come at Lynch's expense. All inferences from her behavior indicate that she did not want Lynch involved in, or harmed by, her embezzlement. Even though Bartlett handled roughly 75 accounts belonging to Lynch, she confined her embezzlement to Ms. Lynch's personal accounts. Pogue Depo. at 10. In addition, much of Bartlett's scheme depended on the weekly dispensing of spending money to Ms. Lynch from her accounts, which did not involve Lynch in its corporate capacity. Finally, Bartlett's experience in her position supports an inference that she knew no direct loss to Lynch would follow from her wrongdoing. An embezzler always has the manifest intent to cause a loss because her gain comes at the expense of the victim. See *Lustig*, 961 F.2d at 1165. Here, however, the evidence demonstrates that Ms. Lynch, rather than Lynch itself, was Bartlett's intended victim. Potomac is therefore correct in asserting that Bartlett did not have the necessary manifest intent to trigger coverage.

### 3. *Insured Must Own, Hold, or Be Legally Liable for Lost Property*

■ The policy describes the interests it covers as follows:

The property covered under this insurance is limited to property:

a. That you own or hold; or

b. For which you are legally liable.

However, this insurance is for your benefit only. It provides no rights or benefits to any

other person or organization. Motion, Exhibit D at 52–53 ¶ 12.

As used in the above provisions, "you" and "your" are defined as the named insured, Lynch. *Id.* at 51.

Potomac argues that this language, considered in its entirety, does not provide coverage for a loss suffered by Ms. Lynch, a third party, which the insured, Lynch, has decided to make good. In addition, Potomac disputes that the services Lynch performed for Ms. Lynch's accounts resulted in Lynch holding or assuming legal liability for the funds. Lynch responds that the policy does not in any way restrict the definition of "hold" or "legally liable" so that Ms. Lynch's funds are covered property interests. Lynch also argues that the "your benefit only" language does not preclude coverage for Lynch's liability to third parties but rather only declares that the policy confers no third party beneficiary rights.

On the facts of this case, Potomac's argument is more persuasive. The funds involved here were private and completely separate from any accounts Lynch maintained as part of its business. Essentially, the arrangement that Ms. Lynch had with Lynch was based on family ties; only she and her two sons could authorize the issuance of checks from her accounts, and the funds in those accounts derived· from her and her husband's lifetime work and savings. Pogue Depo. at 29–30. No formal, written agreement governed the arrangement between Ms. Lynch and Lynch. Although Ms. Lynch did pay a fee to Lynch, this fee was compensation for simple accounting duties and was distinguished from the much larger fee paid to Lynch for management of investments and property. It is true that Bartlett handled cash from Ms. Lynch's accounts, but the family authorization required for Bartlett to be in such a position and the short time that Bartlett had the cash, are inconsistent with Lynch being the holder of the funds.

In light of these facts, the policy's language regarding covered property interests is not ambiguous. Although Lynch disputes Potomac's narrower interpretation of the terms "hold" and "legally liable," the disagreement alone cannot create ambiguity. *D.E.W., Inc.,* 957 F.2d at 199. Nor does the policy's language as applied to these facts create ambiguity. See *CBI Industries,* 907 S.W.2d at 520 ("A latent ambiguity arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter.").

The capacity in which Lynch handled Ms. Lynch's funds falls short of that involved in the cases Lynch cites to demonstrate that the "hold" or "legally liable" provisions trigger coverage in this case. *Fidelity and Deposit Company of Maryland v. USAFORM Hail Pool, Inc.,* 523 F.2d 744, 753–54 (5th Cir.1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976), involved funds fraudulently diverted from trust accounts. *Elmer Fox & Company v. Commercial Union Insurance Company of New York,* 274 F.Supp. 235, 239–40 (D.Colo. 1967), involved not only different and broader policy language but also a contractual relationship between the insured and its customer. The policy in *Alberts v. American Casualty Co. of Reading, Pa.,* 88 Cal.App.2d 891, 200 P.2d 37, 39–41 (1948), involved broad language identical to that in *Elmer* and the loss by a hotel of a guest's money held in its safe. *American Employers' Ins. Co. v. Johnson,* 47 S.W.2d 463, 464, 466 (Tex.Civ. App.—San Antonio 1932, writ dism'd w.o.j.), also involved more general language and there the court held that "[t]o all intents and purposes it was [the insured's] property that was … embezzled.…" Based on the more tenuous connection between Lynch and Ms. Lynch's funds, and the policy's other provisions disallowing coverage for indirect losses, this court finds that there is no ambiguity[3] in the terms "hold" or "legally liable" and that Lynch is not covered under these terms.

---

3. Because the court finds no ambiguity in the contract's terms, it cannot consider the supplementary summary judgment evidence offered by Lynch regarding a claim under a similarly worded policy issued by one of Potomac's sister companies. See *CBI Industries,* 907 S.W.2d at 520 ("Only where a contract is first determined to be ambiguous may the courts … admit extraneous evidence to determine the true meaning of the instrument") (citations omitted).

#### 4. Exclusion for Indirect Losses

■ Under the heading of "General Exclusions," the policy provides that Potomac will not pay for any indirect loss, which is defined as:

Loss that is an indirect result of any act or "occurrence" covered by this insurance including, but not limited to, loss resulting from:

b. Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this insurance.

Motion, Exhibit D at 51.

Potomac argues that this provision denies coverage because it specifically excludes claims brought by an insured for liability that it may have to third parties due to dishonest acts of the insured's employees. Lynch rejoins that the exclusion does not apply because it is not making a claim for damages but rather for a loss of property.

While it is true that Lynch makes no claim for recovery of damages in this case, the indirect loss exclusion nevertheless helps to determine the policy's meaning. In *Lustig*, the Fifth Circuit found that an identically worded exclusion did not "create an ambiguity in the policy suggesting liability coverage." *First National Bank of Louisville v. Lustig*, 975 F.2d 1165, 1167 (5th Cir.1992). To the contrary, here the exclusion helps to establish that the trigger for coverage under the policy, either for indemnification or compensatory damages, is a loss suffered by the insured as a direct result of an employee's wrongdoing. Bartlett's embezzlement did not cause any direct out of pocket loss for Lynch; rather, Lynch's loss arose from its later decision to replace the lost funds. See *Central National Insurance Company of Omaha v. Insurance Company of North America*, 522 N.W.2d 39, 43, 44 (Iowa 1994) (construing similar policy and concluding that the "policy language clearly insures [the insured] for actual losses to [the insured] but does not indemnify the losses third parties may sustain because of the wrongful actions of [the insured] or its employees."); *175 East 74th Corporation v. Hartford Accident & Indemnity Company*, 51 N.Y.2d 585, 435 N.Y.S.2d 584, 416 N.E.2d 584, 587 (1980) ("That the insured may be liable to a third party for a loss of money resulting from employee dishonesty does not transform a policy covering the insured against a direct loss into one indemnifying against liability. . . ."). The indirect loss exclusion, which is "not limited to" indirect losses in the form of liability to third parties, reinforces the conclusion that the policy meant to insure Lynch only against immediate harm from employee dishonesty but not for any obligations Lynch might have to others as a result of that dishonesty. Because Lynch suffered only an indirect loss in this case, and because the policy's language clearly excludes such losses from coverage, Potomac properly denied Lynch's claim. See *Exeter Banking Company v. New Hampshire Insurance Company*, 121 N.H. 1083, 438 A.2d 310, 314 (1981) (construing fidelity policy and concluding that insurer must pay claim based on insured's liability to third party because policy "neither excludes nor limits the [insurer's] liability for indirect losses").

#### D. Lynch's Extra–Contractual Claims

■ In light of the foregoing, the court cannot conclude that Potomac acted in bad faith or lacked any reasonable basis in denying Lynch's claim. On the contrary, the summary judgment evidence indicates that Potomac investigated both the facts and the policy's scope and sought legal advice because of uncertainty over the extent of coverage. Davis Depo. at 94–95. Lynch contends that the case law clearly required Potomac to pay its claim, but given the facts in this case and the lack of definitive Texas authority, the court finds this argument unpersuasive. Lynch bears the burden of proving that no reasonable basis existed for denial of its claim, *Pioneer Chlor Alkali Company, Inc. v. Royal Indemnity Company*, 879 S.W.2d 920, 939 (Tex.App.—Houston [14th Dist.] 1994, no writ), and also of demonstrating that a genuine issue of material fact exists as to its extra-contractual claims. *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53; *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11. Since Lynch has not shown that it can meet either burden, summary judgment in favor of Poto-

mac is appropriate as to Lynch's extra-contractual claims.

### III. CONCLUSION

This Circuit has dearly held that "[l]iability of an indemnitor under a fidelity bond does not arise until the indemnitee has suffered a loss within the scope of the coverage." *Everhart v. Drake Management, Inc.*, 627 F.2d 686, 691 (5th Cir.1980). For the reasons stated above, this court finds that no material fact issues exist as to the policy's meaning, or the facts underlying Lynch's claim, to show that Lynch suffered a loss under the policy's terms and exclusions. To find otherwise would be to enlarge the construction of the policy beyond its actual terms, which is forbidden under Texas law. See *Texas Pacific,* 846 S.W.2d at 583. The court also finds that no genuine issues of material fact exist as to Lynch's extra-contractual claims. Accordingly, Potomac's motion for summary judgment is **GRANTED.**

**SO ORDERED.**